United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 29, 2007**

Charles R. Fulbruge III
Clerk

REVISED April 2, 2007
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
_____

No. 04-50393
_____

UNITED STATES OF AMERICA,

                            Plaintiff - Appellee,

     v.

SHERMAN LAMONT FIELDS,

                            Defendant - Appellant.
_____

Appeal from the United States District Court
for the Western District of Texas
No. 6:01-CR-164-1
_____

Before: KING, SMITH, and BENAVIDES, Circuit Judges.


BENAVIDES, Circuit Judge, writing for the Court except as to Parts

II.A.1-3

SMITH, Circuit Judge, writing for the Court in Parts II.A.1-3[1]


     This is a direct appeal in a federal death penalty case.

Sherman Fields challenges his seven convictions and his death

sentence, claiming more than twenty different errors.  For the

reasons below, we reject all of Fields's claims of error and,

accordingly, affirm his convictions and sentences.

                    I.  BACKGROUND

_____

     [1] The writings for the Court are unanimous, except as to
Part II.A.1, authored by Judge Smith and joined only by Judge King.

The evidence presented at trial reveals the following:  Fields was arrested on federal firearms charges in September 2001.  He was held in federal custody at the McClennan County Detention Center in Waco, Texas.  In November 2001, Fields bribed a correctional officer—paying him $5000 in exchange for a key to the detention center's fire escape door.  Using the key, Fields escaped.

After fleeing federal custody, Fields met up with a friend.  Through this friend, Fields obtained a car and a .32 caliber revolver.  That evening, Fields visited his ex-girlfriend, Suncerey Coleman, at Hillcrest Hospital in Waco, where she was attending to her newborn baby.  Fields was angry with Coleman for seeing other men.  After Fields and Coleman conversed for some time, Fields convinced her to leave the hospital with him.  They drove to Downsville, Texas, a small town just outside of Waco.  The two had sexual intercourse,[2] and then Fields shot Coleman twice in the head.  After that, he dragged her dead body from the road into some underbrush to hide it.

Several days later, Fields approached a Hillcrest Hospital employee, Tammy Edwards, while Edwards was exiting her car.  Brandishing a handgun and grabbing her by the throat, Fields demanded that Edwards get back in the car.  Although Edwards was able to struggle free, Fields managed to wrestle away her car keys.  Fields drove away in Edwards's car.

---

[2] It is unclear whether the sex was consensual.

Coleman's body was found on November 21, more than two weeks after her death. Three days later, police rearrested Fields. The Government charged Fields by a seven-count indictment with (1) conspiring to escape from federal custody, (2) escaping from federal custody, (3) using and carrying a firearm during and in relation to escape, resulting in intentional murder, (4) carjacking, (5) using and carrying a firearm during and in relation to carjacking, (6) felon in possession of a firearm, (7) using and carrying a Ruger .22 caliber firearm during and in relation to escape.

At trial, Fields asked to represent himself. The district court advised against such a course of action. After Fields insisted, the court instructed his two previously-appointed attorneys to act as standby counsel. Following several days of evidence, the jury convicted Fields on all counts.

The Government sought a death sentence on the murder count pursuant to 18 U.S.C. § 924(j)(1).[3] At his separate trial on sentencing,[4] Fields waived his right to proceed *pro se* and was represented by counsel. Fields objected on Confrontation Clause grounds to the admission of certain out-of-court statements to

---

[3] As to the noncapital counts, the district court sentenced Fields to 715 months of imprisonment.

[4] This was a typical one-part sentencing proceeding. The court did not hold separate hearings on death eligibility and selection, as some courts have recently done in "trifurcated" capital trials. *See, e.g.*, *United States v. Johnson*, 378 F. Supp. 2d 1051 (N.D. Iowa 2005).

3

establish that Fields committed prior violent crimes. After hearing additional evidence, the jury recommended the death penalty. Following this recommendation, the court sentenced Fields to death. Fields appealed, challenging his convictions and his death sentence.

## II.  DISCUSSION

While Fields raises a variety of potential trial errors, his more substantial claims concern the sentencing phase of trial. At the expense of a chronological account of the trial proceedings, we begin by addressing the sentencing issues before turning to the potential trial errors.

## A.    CLAIMS OF SENTENCING ERROR

### 1.  CONFRONTATION

Fields maintains that the district court erred by admitting testimonial hearsay at his capital sentencing proceeding in violation of *Crawford v. Washington*, 541 U.S. 36 (2004). Fields preserved this purely legal claim of error at sentencing, so our review is *de novo*.

#### a. The Nature of the Confrontation Clause Challenge

Fields challenges, on the basis of the Confrontation Clause, the introduction at sentencing of several hearsay statements of five types: (1) statements made about him by his mother and juvenile probation officers in various records introduced into evidence by a Juvenile Probation Department official; (2) statements made

about him by corrections officers in prison records introduced into evidence by state prison officials; (3) statements made by officers in police reports introduced into evidence by someone other than the officer who had made the report; (4) a detective's description, based on the investigating officer's report, of the drive-by shooting that led to Fields's 1992 conviction of attempted murder; and (5) statements made by witnesses to police officers while the officers were investigating various past crimes in which Fields may have been involved but for which he was never charged (the statements being described in the officers' testimony).

None of the challenged statements was presented as part of the government's effort to establish the statutory aggravating factors that trigger death-eligibility under the Federal Death Penalty Act ("FDPA"). *See* 18 U.S.C. § 3592(c). Indeed, the statements are not in any way relevant to the eligibility-triggering factors included in the government's Notice of Intent To Seek a Sentence of Death. Those factors are (1) that Coleman's death occurred during Fields's commission of (or immediate flight from the commission of) an escape in violation of 18 U.S.C. § 751; (2) that Fields had been convicted of a federal or state offense punishable by imprisonment for more than one year, involving the use, attempted use, or threatened use of a firearm; and (3) that he had committed the offense after substantial planning and preparation to cause the death of

another.[5]  Rather, all of the challenged statements were introduced as part of the government's effort to establish Fields's past violent conduct and future dangerousness, both of which are non-statutory aggravating factors that were included in the government's notice.[6]

The establishment of nonstatutory aggravating factors is neither necessary nor sufficient to authorize imposition of the death penalty.  Nonstatutory aggravating factors may be considered by the jury in selecting an appropriate sentence once a defendant is found eligible for the death penalty, but they are not, and cannot be, used to determine that eligibility, as the Supreme Court has explained:

> [S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition:  they circumscribe the class of persons eligible for the death penalty.  But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.

*Zant v. Stephens*, 462 U.S. 862, 878 (1983).

Because they relate only to nonstatutory aggravating factors,

---

[5] The jury found two of the three aggravating factors beyond a reasonable doubt (all but "substantial planning and preparation").  Indeed, Fields stipulated to the prior felony conviction involving the use of a firearm.

[6] *See* 18 U.S.C. § 3593(d); *see also United States v. Jones*, 132 F.3d 232, 240 (5th Cir. 1998) (stating that "[a]fter finding the existence of at least one statutory aggravating factor [under the FDPA], the jury may consider the existence of nonstatutory aggravating factors for which notice has been given by the government"), *aff'd*, 527 U.S. 373 (1999).

the hearsay statements challenged by Fields are relevant only to the jury's selection of an appropriate punishment from within an authorized range and not to the establishment of his eligibility for the death penalty. After reviewing the applicable caselaw and considering the particular importance of "individualized sentencing" in capital cases, we conclude that the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority's selection decision.[7]

### b. Constitutional Rights at Capital Sentencing: *Williams v. New York*

Constitutional rights traditionally have been more circumscribed at sentencing, even capital sentencing, than during the guilt phase. In *Williams v. New York*, 337 U.S. 241 (1949), a state judge sentenced a defendant to death on the basis of information obtained pursuant to a statutory presentence investigation and relayed to the judge outside the courtroom. At the sentencing hearing, the judge explained why he believed the death penalty was appropriate:

> [The judge] stated that the pre-sentence investigation revealed many material facts concerning appellant's background which though relevant to the question of punishment could not properly have been brought to the attention of the jury in its consideration of the question of

---

[7] Because the Confrontation Clause does not apply to the testimony challenged in this case, it is unnecessary to determine whether the relevant statements are testimonial under *Crawford* and *Davis v. Washington*, 126 S. Ct. 2266 (2006). Furthermore, as discussed in more detail *infra*, we decline to decide the applicability of the Confrontation Clause to the presentation of evidence at sentencing that is relevant only to death eligibility or to both eligibility and selection.

> guilt. He referred to the experience appellant "had had on thirty other burglaries in and about the same vicinity" where the murder had been committed. The appellant had not been convicted of these burglaries although the judge had information that he had confessed to some and had been identified as the perpetrator of some of the others. The judge also referred to certain activities of appellant as shown by the probation report that indicated appellant possessed "a morbid sexuality" and classified him as a "menace to society."

*Id*. at 244.

The defendant challenged his sentence on due process grounds, stating that his constitutional rights had been violated because "the sentence of death was based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal." *Id*. at 243. The Supreme Court rejected the challenge, holding that a judge, consistent with due process, could sentence a defendant on the basis of information untested in open court. "[P]ossession of the fullest information possible concerning the defendant's life and characteristics" was "essential" to a judge's selection of an appropriate sentence, and therefore

> we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts state and federal from making progressive efforts to improve the administration of criminal justice.

*Id*. at 247, 251. The Court was urged to "draw a constitutional distinction as to the procedure for obtaining information where the

death sentence is imposed," but it explicitly refused to do so. *Id.* at 251.

*Williams* is a due process, rather than Sixth Amendment, case and therefore does not dictate the result of Fields's Confrontation Clause challenge. We conclude, however, that *Williams*'s distinction between guilt and sentencing proceedings and its emphasis on the sentencing authority's access to a wide body of information in the interest of individualized punishment is relevant to our Confrontation Clause inquiry. Included in the notion that information influencing a sentencing decision need not be introduced in open court is the idea that defendants have no confrontation right at that phase and therefore that testimonial hearsay is not *per se* inadmissible. Indeed, the Court referred to the rights to confront and cross-examine as "salutary and time-tested protections" included within the due process guarantee but available only "where the question for consideration is the guilt of the defendant." *Id.* at 245.[8]

### c. Continuing Relevance of *Williams*

If we adhere to the logic of *Williams*, Fields's Confrontation Clause challenge must fail. The dissent, however, posits that *Williams* is irrelevant to the issue at hand because it is not expli-

---

[8] The Court analyzed the relevant issues in *Williams* under the rubric of due process because the case involved a challenge to a capital sentence imposed by a state court. The Sixth Amendment was not incorporated against the states until *Pointer v. Texas*, 380 U.S. 400 (1965).

citly a Sixth Amendment case and because the *Williams* Court "supposed that there was no 'constitutional distinction' between capital sentencing and ordinary sentencing." Now that later decisions have suggested that "death is different," the dissent takes the position that *Williams* has nothing to offer on the question of the admissibility of evidence at capital sentencing. We disagree.

### i. *Williams*'s Status as a Due Process Case Does Not Preclude Its Relevance

Although it did not do so under the guise of the Sixth Amendment, the *Williams* Court plainly discussed the right of confrontation. Furthermore, even in the wake of the Supreme Court's incorporation of the Sixth Amendment against the states and its application of some, but not all, Sixth Amendment rights at sentencing, see *infra*, *Williams* has never been overruled.[9] In fact, the Court

---

[9] Even the post-incorporation case *Specht v. Patterson*, 386 U.S. 605, 610 (1967), which held that due process requires that a defendant "be present with counsel, have an opportunity to be heard, to be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own" where the sentencing proceeding effectively adds a new charge requiring additional fact-finding and leading to additional punishment, explicitly declined to overrule *Williams*. *See Specht*, 386 U.S. at 608. Although a stronger argument can be made that the death-eligibility phase of a capital sentencing proceeding is similar to a proceeding qualifying for enhanced due process protections under *Specht*, there is a constitutionally significant distinction between statutory aggravating factors necessary to establish death-eligibility and nonstatutory aggravating factors that may be considered only after a defendant has been determined to be death eligible. *See United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005) (holding that failure to charge nonstatutory aggravating factors in indictment is not constitutional error because under the FDPA "only statutory factors expose a criminal defendant to the death penalty") (relying on *Jones v. United States*, 527 U.S. 373, 377 (1999)). Accordingly, *Specht* is not applicable to this case because the evidence Fields challenges

(continued...)

continues to cite *Williams* for the proposition that there are no

*per se* constitutional prohibitions on the introduction of hearsay

at sentencing.[10]

These decisions discuss *Williams*, and the constitutional limi-

tations on the scope and type of information a sentencer may con-

sider, under the umbrella of due process rather than the Sixth

Amendment.  This circumstance may be significant:  In ruling that

the enactment of the Sentencing Guidelines did not transform ordi-

nary sentencing into a separate criminal proceeding, requiring, un-

der *Specht v. Patterson*, 386 U.S. 605 (1967), that a defendant be

accorded the full panoply of trial rights, the Eighth Circuit stat-

ed the following:

> We recognize that *Williams v. New York*, *Williams v. Okla-
> homa*, and *Specht* all considered the application of the
> right to confront witnesses under the rubric of the Due
> Process Clause of the Fourteenth Amendment, [but] . . .
> we note that *Specht* was decided after the Sixth Amend-
> ment's Confrontation Clause was found applicable to the
> States via the Fourteenth Amendment.  *Pointer v. Texas*,
> 380 U.S. 400 . . . (1965).  *That the Supreme Court anal-
> yzed the right of confrontation both before and after*
> Pointer *as an issue of due process suggests that due pro-
> cess, not the Confrontation Clause, provides the relevant
> framework for testing the use of hearsay testimony at a*

---

[9](...continued)
relates only to nonstatutory aggravating factors.

[10] *See, e.g.*, *United States v. Tucker*, 404 U.S. 403, 446-47 (1972)
(citing, *inter alia*, *Williams* for the proposition that in selecting a
sentence, "a judge may appropriately conduct an inquiry broad in scope,
largely unlimited either as to the kind of information he may consider,
*or the source from which it may come*") (emphasis added); *see also Witte
v. United States*, 515 U.S. 389, 397-98 (1995); *Wisconsin v. Mitchell*,
508 U.S. 476, 485 (1983).

*sentencing proceeding.* Other courts have relied on a due process analysis rather than the Confrontation Clause when considering the right of confrontation at sentencing. *See, e.g.*, *United States v. Berzon*, 941 F.2d 8, 16-21 (1st Cir. 1991); *United States v. Castellanos*, 904 F.2d 1490, 1495-96 (11th Cir. 1990); *United States v. Carmona*, 873 F.2d 569, 574-75 (2d Cir. 1989); *United States v. Richards*, 784 F. Supp. 1373, 1377-78 (N.D. Ind. 1992).

*United States v. Wise*, 976 F.2d 393, 398 n.2 (8th Cir. 1992) (en banc) (emphasis added). More recently, in holding that *Crawford* does not apply at sentencing, the Seventh Circuit has stated that "the relevant provision at sentencing is the Due Process Clause, not the confrontation clause; *Williams* shows that witnesses providing information to the court after guilt is established are not accusers within the meaning of the confrontation clause." *United States v. Roche*, 415 F.3d 614, 618 (7th Cir.), *cert. denied*, 126 S. Ct. 671 (2005).[11]

### ii. *Gardner v. Florida*

Perhaps more importantly, *Gardner v. Florida*, 430 U.S. 349 (1977), a post-incorporation decision regarding procedural requirements at capital sentencing, establishes that *Williams* remains relevant in the capital sentencing context. In *Gardner*, a plurality held that a defendant cannot be sentenced to death on the basis of

---

[11] *Roche* is a noncapital case. The Seventh Circuit, however, had ruled, on the basis of *Williams*, that "the Supreme Court has held that the Confrontation Clause does not apply to capital sentencing. It applies through the finding of guilt, but not to sentencing, even when that sentence is death." *Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002).

information undisclosed to a defendant and contained in a presentence investigation report because, to satisfy due process, a capital defendant must be given a chance to rebut or explain adverse information introduced at sentencing. *Id*. at 362. At first blush, this ruling appears to call the core holding of *Williams* into doubt. Any characterization of *Gardner* as a *Williams*-killer and a harbinger of the application of the confrontation right at capital sentencing would be misplaced, however, for at least two reasons.

First, *Gardner*, like *Williams*, is a due process case. Asked to examine what rights defendants have under the Due Process Clause with regard to the presentation of evidence at capital sentencing, the Court noted that defendants were entitled to effective assistance of counsel during sentencing, *id.* at 358, but made no mention of a right of confrontation, lending further credence to the notion that the categorization of *Williams* as a pre-incorporation due process case does not vitiate its relevance to the issue with which we are faced.

Second, *Gardner* explicitly declined to overrule *Williams* and instead distinguished it, stating that "the holding of *Williams* is not directly applicable to this case." *Id*. at 356. "[I]n *Williams* the material facts concerning the defendant's background which were contained in the presentence report were described in detail by the trial judge in open court," affording the defendant the opportunity "to challenge the accuracy or materiality" of said facts. *Id*. The

13

*Gardner* plurality held only that a defendant's due process rights are abridged where he is given no similar "opportunity to deny or explain" adverse evidence, *id*. at 362, and the plurality was careful to note that "[t]he fact that due process applies [at capital sentencing proceedings] does not, of course, implicate the entire panoply of criminal trial procedural rights," *id*. at 358 n.9.

The dissent notes that the *Gardner* plurality also distinguishes *Williams* on the ground that "[t]he trial judge in *Williams* was not asked to '"afford appellant a chance to refute or discredit any of [the statements at issue] by cross-examination or otherwise."' *Id*. at 356 (quoting *Williams*). As the Second Circuit has stated, however, *Williams* "does not turn on any concept of waiver by failure to object. It rests, rather, on the broad ground that due process does not preclude reliance on out-of-court information in imposing sentence." *United States v. Fatico*, 579 F.2d 707, 712 n.11 (2d Cir. 1978).

More importantly, despite making note of the *Williams* defendant's failure to object at sentencing to the denial of an opportunity to challenge the veracity of the relevant information through, *inter alia*, cross-examination, *Gardner* nowhere suggests that cross-examination of hearsay declarants in particular is necessary to satisfy due process. *Gardner* instead focuses solely on whether information has been disclosed to the defendant so that he can "deny or explain" it by any means.

14

*Gardner* offers no basis for assuming that cross-examination of a witness presenting hearsay evidence, for example, would not be sufficient to satisfy constitutional concerns, a fact that Professor John Douglass, whose work is cited frequently by the dissent, fully acknowledges: "The Court has never said that the right to 'deny or explain' sentencing information includes the confrontation rights that *Williams* rejected: the right to see, hear, and cross-examine the sources of that information."[12]

For the same reason, *Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979), neither compels nor implies the rejection of the principles underlying *Williams* and the extension of the confrontation right to capital sentencing. There, we held that a defendant's due process rights were violated by the state's calling a psychiatrist as a surprise witness at a capital sentencing proceeding. Reasoning from *Gardner*, we stated that "[s]urprise can be as effective as secrecy in preventing effective cross-examination, in denying 'opportunity for (defense) counsel to challenge the accuracy or materiality of' evidence." *Id*. at 699 (quoting *Gardner*). We never hinted, however, that providing a defendant the opportunity to

_____

[12] John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L. Rev. 1967, 1980 (2005). Indeed, the *Williams* Court's reference, picked up by the *Gardner* Court, to the defendant's failure to challenge the relevant information "by cross-examination *or otherwise*" arguably suggests that cross-examination in general, and thus cross-examination of a hearsay declarant in particular, should not be deemed the only effective means of denying or explaining adverse information at sentencing.

15

question, with advance preparation, a witness presenting hearsay evidence would not satisfy due process.[13]

The decision in *Del Vecchio v. Ill. Dep't of Corr.*, 31 F.3d 1363, 1387 (7th Cir. 1994), offers support for the proposition that the due process guarantee of an opportunity to "deny or explain" evidence does not undercut *Williams*'s sanction of the use of out-of-court statements at capital sentencing.  In *Del Vecchio*, the court was faced with a capital defendant's challenge, on Confrontation Clause grounds, to the in-court testimony of two psychiatrists "that they had perused medical reports from other psychiatrists who had examined Del Vecchio, and that the conclusions reached in those reports supported their opinions" that the defendant was a socio-path.  The court held that Illinois's statute permitting the admission of such hearsay at capital sentencing adequately protected the defendant's constitutional rights by "providing that [defendants] 'shall be given a fair opportunity to rebut any information received at the hearing.'"  *Id*. at 1388.  The defendant had in fact been given that opportunity, because "[h]e had access to the contested hearsay reports; he could have cross-examined Drs. Rogers and Cavanaugh about the reports; he could have called his own experts."  *Id*.

Based on the above, we find wholly unpersuasive the Eleventh

---

[13] This logic applies equally to the generic reference to "the benefit of cross examination" in *Barefoot v. Estelle*, 463 U.S. 880, 898-99 (1983).

Circuit's extension (in reliance on *Gardner* and *Smith*) of the Sixth Amendment confrontation right through the entirety of the capital sentencing process, and we note that that circuit is the only one to have taken that step.[14]  The Seventh Circuit has ruled, pursuant to *Williams*, that the Confrontation Clause does not apply at capital sentencing,[15] and the Fourth Circuit has expressed doubt that it does.[16]

### d.  "Death is Different"

Expanding the scope of our inquiry beyond *Gardner*, the Supreme Court's more general "death is different" jurisprudence does not call into doubt either the relevance or the persuasiveness of *Williams* on the question presented in the instant case.  An examination of Court precedent regarding the Sixth and Eighth Amendments indicates that "at least with regard to the rights listed in the Sixth Amendment, the Court's rules for capital sentencing are essentially the same as for noncapital sentencing . . . .  When it

---

[14] *See Profitt v. Wainwright*, 685 F.2d 1227, 1252-55 (11th Cir. 1982); *United States v. Brown*, 441 F.3d 1330, 1361 n.12 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 1149 (2007).

[15] *See Szabo*, 313 F.3d at 398 (stating additionally that on collateral review it was "not entitled" to question the holding of *Williams* in light of more recent developments in capital sentencing).

[16] *See United States v. Higgs*, 353 F.3d 281, 324 (4th Cir. 2003) (stating that under plain error standard of review "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding") (citing *United States v. Terry*, 916 F.2d 157, 160-61 (4th Cir. 1990), for the proposition that "United States courts have a long history of using reliable hearsay for sentencing" and a "trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain").

comes to Sixth Amendment rights at sentencing, it seems, death is not so different after all."  Douglass, *Confronting Death*, 105 COLUM. L. REV. at 1993.

> ### i.   Application of Sixth Amendment Rights at Sentencing

Since *Williams* was decided, certain Sixth Amendment rights have been applied incrementally to the sentencing process, capital and noncapital.  Now criminal defendants have a right to counsel throughout sentencing.[17]  Likewise, they have a right to a jury finding, beyond a reasonable doubt, of any facts necessary to expose a defendant to a higher maximum penalty, including death, regardless of whether those facts are labeled "sentencing factors" rather than elements of the offense.[18]

---

[17] *See Mempa v. Rhay*, 389 U.S. 128, 134, 137 (1967) (stating that the right is applicable at sentencing in general); *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984) (holding that the right applies at capital sentencing in particular).

[18] *See Apprendi v. New Jersey*, 530 U.S. 466, 482-83 (2000); *Ring v. Arizona*, 536 U.S. 534, 609 (2002).  In *Schriro v. Summerlin*, 542 U.S. 348, 354 (2004), the Court explained that *Ring* stands for the proposition that "*because* Arizona's statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggravators *effectively* were elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements."  Accordingly, there is a stronger argument to be made for the attachment of the confrontation right where the government is attempting to establish eligibility-triggering factors: Though labeled as "sentencing factors," those factors are more appropriately considered as elements of a capital offense.  This logic applies equally to the establishment of any sentencing factors necessary to expose a defendant to a higher maximum penalty in the noncapital context.

As discussed *supra*, Fields's Confrontation Clause challenge relates only to evidence that the government introduced relevant to the jury's

(continued...)

When it comes to the ultimate selection of an appropriate punishment out of a range of available options, however, there is no constitutional right to jury sentencing in a noncapital or capital case.[19] And with regard to the confrontation right, caselaw definitively maintains the *Williams* principle in the noncapital context and establishes that the right does not apply at sentencing. In particular, the Confrontation Clause does not operate to bar the introduction of testimonial hearsay at noncapital sentencing.[20]

---

(...continued)
ultimate selection decision. The applicability of the Confrontation Clause to the establishment of eligibility-triggering factors is therefore not a question squarely presented by this case, and we decline to resolve it definitively.

[19] *See McMillan v. Pennsylvania*, 477 U.S. 79, 93 (1986) (holding that "there is no Sixth Amendment right to jury sentencing"); *Cabana v. Bullock*, 474 U.S. 376, 385 (1986) (observing that "[t]he decision whether a particular punishment . . . is appropriate in any given case is not one that we have ever required to be made by a jury"); *Spaziano v. Florida*, 468 U.S. 447, 460 (1984) (reasoning that "there certainly is nothing in the safeguards necessitated by the Court's recognition of the qualitative difference of the death penalty that requires that the sentence be imposed by a jury").

[20] *See Tucker*, 404 U.S. at 446-47; *Witte*, 515 U.S. at 397-98; *Mitchell*, 508 U.S. at 485; *see also, e.g., Hall*, 152 F.3d at 405; *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006); *United States v. Rodriguez*, 897 F.2d 1324, 1328 (5th Cir. 1990) (reasoning that "[a] court may rely on uncorroborated hearsay testimony" at noncapital sentencing); *Roche*, 415 F.3d at 618 (observing that the Confrontation Clause, and therefore *Crawford*, do not apply at sentencing); *United States v. Luciano*, 414 F.3d 174, 179 (1st Cir. 2005) (explaining that "[n]othing in *Crawford* requires us to alter our previous conclusion that there is no Sixth Amendment Confrontation Clause right at sentencing"); *United States v. Martinez*, 413 F.3d 239, 243 (2d Cir. 2005) (noting that "[n]either *Crawford* nor *Booker* . . . addressed the applicability of the right of confrontation to the sentencing context or the admissibility of hearsay testimony at sentencing proceedings," and therefore "[t]hese cases . . . provide no basis to question prior Supreme Court decisions that expressly approved the consideration of out-of-court statements at

(continued...)

19

Here we are asked to decide whether the confrontation right applies with full force throughout capital sentencing, despite the fact that it is nonexistent at ordinary sentencing. Given that, as shown above, no other Sixth Amendment right has been applied (*vel non*) differently at capital sentencing from how it is applied at noncapital sentencing, there is little reason to establish divergent rules with regard to the confrontation right when the sentencing authority is selecting a sentence from within an authorized range.

On the basis of the Supreme Court's consistent treatment of Sixth Amendment rights across capital and noncapital cases alone, we find unpersuasive the dissent's textual argument for why the Confrontation Clause should extend through the entirety of the capital sentencing process, in light of the fact that the jury right extends only as far as the eligibility determination. The dissent contends that

> [t]he Jury Clause has a unique second limitation that does not apply to the Right to Counsel or the Confrontation Clause: only a jury "trial" is required. A jury is only required at trial, whereas both the Right to Counsel and the Confrontation Clause apply more broadly to the whole "criminal prosecution," and thus to sentencing.

(Internal quotations and citations omitted.) This textual argument proves too much, for it would apply equally at noncapital sentenc-

---

[20](...continued)
sentencing"); *United States v. Chau*, 426 F.3d 1318 (11th Cir. 2005) (confirming that "there is no precedent from this Court or from the Supreme Court establishing that the Confrontation Clause prohibits the admission of hearsay evidence at sentencing proceedings").

20

ing, where it has already been established that the right of confrontation is nonexistent.[21]

The dissent's argument in favor of the application of the Confrontation Clause throughout capital sentencing based on the interplay of the right to counsel and the right of confrontation falters on similar grounds. The dissent states that "[t]he Sixth Amendment extends the rights both to counsel and to confrontation in 'all criminal prosecutions,' suggesting that where one right applies, the other does too." The dissent further asserts that "[r]equiring confrontation in the FDPA's trial-like sentencing regime is particularly appropriate given the interdependence of adversarial rights . . . . [A] meaningful Right to Counsel at capital sentencing depends on confrontation rights." But if, as the dissent suggests, the right to counsel and the right of confrontation are adversarial tools that move in lock step, that again begs the question: Why is the confrontation right admittedly nonexistent at noncapital sentencing, even though the right to counsel plainly applies throughout such proceedings?

To address this dilemma, the dissent emphasizes that capital

---

[21] Furthermore, caselaw from other circuits calls into question the dissent's textual interpretation of the Sixth Amendment. "As a textual matter, the sixth amendment, which refers to 'criminal prosecutions,' arguably applies only at trial," thus suggesting that the words "prosecution" and "trial" are in fact interchangeable. *United States v. Kikumura*, 918 F.2d 1084, 1102 (3d Cir. 1990). "A sentencing hearing . . . is not a 'criminal prosecution' within the meaning of the Sixth Amendment because its sole purpose is to determine only the appropriate punishment for the offense, not the accused's guilt." *United States v. Francis*, 39 F.3d 803, 810 (7th Cir. 1994).

21

sentencing is "more adversarial" than is noncapital sentencing: "The Confrontation Clause should apply fully because FDPA sentencing, unlike noncapital sentencing, involves a trial-like adversarial proceeding." For this proposition the dissent relies on *Bullington v. Missouri*, 451 U.S. 430, 438-39 & n.10 (1981), by stating that "[t]he Supreme Court applies certain 'trial rights' to adversarial sentencing hearings that bear the 'hallmarks of the trial on guilt or innocence.'"

*Bullington*, however, is a Fifth Amendment double jeopardy case, and the Court in *Spaziano* stated as follows:

> The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause . . . does not mean that it is like a trial in respects significant to the Sixth Amendment's guarantee of a jury trial. The Court's concern in *Bullington* was with the risk that the State, with all its resources, would wear a defendant down, thereby leading to an erroneously imposed death penalty. There is no similar danger involved in denying a defendant a jury trial on the sentencing issue of life or death. The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer's decision for life is final. *More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceedingSSa determination of the appropriate punishment to be imposed on an individual* . . . . The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.

*Spaziano*, 468 U.S. at 459 (emphasis added) (internal citations omitted). The Court's analysis indicates that despite the "unique aspects" of a capital sentencing proceeding, it is not, with respect to the ultimate issue to be decided (the selection of an ap-

22

propriate punishment), any more "trial-like" than is ordinary sentencing, where the Confrontation Clause has been held inapplicable.[22]

_____

[22] In support of its argument regarding the adversarial nature of capital sentencing proceedings, the dissent makes note of the heightened procedural requirements applied, as a matter of statutory rather than constitutional imperative, in sentencing hearings under the FDPA. In particular, the dissent emphasizes that the Act requires jury sentencing, even though the Sixth Amendment does not. The dissent then cites *Robinson v. Polk*, 438 F.3d 350, 359 (4th Cir.), *cert. denied*, 127 S. Ct. 514 (2006), for the proposition that the Confrontation Clause "applies equally to sentencing proceedings tried to a jury." *Robinson* reaches that conclusion based on *Morgan v. Illinois*, 504 U.S. 719, 727-28 (1992).

*Morgan*, however, holds only that due process mandates that in trials in which a jury is not constitutionally required, if one is provided, it "must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Id*. at 727. Thus, a jury demanded by statute rather than the Constitution must still, for example, be free from racial bias. *Morgan* says nothing, though, about the manner in which evidence must be presented at sentencing in general, or in front of a sentencing judge or jury in particular. Accordingly, *Robinson* is unpersuasive.

The dissent's citation of *United States v. Cardenas*, 9 F.3d 1139, 1154-56 (5th Cir. 1993) (en banc), does not boost its argument on this score. The dissent states that *Cardenas* recognizes "that the Confrontation Clause may provide greater rights in cases tried before juries than in bench trials." Like *Morgan*, however, *Cardenas* says nothing about the application of the clause *at sentencing*, whether the proceeding is before a jury or a judge. Instead, it stands only for the unremarkable proposition that the clause applies during the guilt phase of a trial to prevent the use of incriminating out-of-court statements made by a co-defendant who has not been cross-examined, and it suggests that barring the admission of such statements is perhaps less crucial when the question of guilt or innocence is being determined by a judge, given that a judge is capable of "disregarding inadmissible extrajudicial statements implicating a defendant." *Id*. at 1154.

There is a constitutionally significant distinction between a trial of the elements of an offense and the selection of an appropriate penalty from an available range once guilt has been determined, and neither this Court nor the Supreme Court has indicated that the permissible, though not constitutionally required, use of jury sentencing renders necessary the application of the Confrontation Clause

(continued...)

23

Further to justify its proposed anomalous divergent treatment of capital and noncapital sentencing with regard to the Confrontation Clause, the dissent also relies on the history of capital murder trials, stating that "[a]t the time the Confrontation Clause was written, a capital trial was a single, unified proceeding at which both guilt and sentence were decided. The Framers knew nothing of capital sentencing proceedings separate from trial." If one was convicted of a capital felony, one was automatically sentenced to death. According to the dissent, the trial became a "*de facto* sentencing proceeding" in which the jury would render a verdict in favor of a lesser crime if it did not think the death penalty was warranted. The dissent asserts that

> [t]he critical point is this: because these *de facto* capital sentencing proceedings took the form of full criminal trials, the defendant possessed full trial rights of confrontation. However, the notion that capital sentencing might be conducted 'outside of an adversarial trial' is strictly a 'post-constitutional' phenomenon.

---

(...continued)

to the selection decision. Furthermore, even if one were to accept the notion that because the FDPA employs jury sentencing, the Confrontation Clause should apply throughout federal capital sentencing proceedings, the notion that jury sentencing implicates greater constitutional rights does nothing to support the broader position advocated by the dissent: That is, that the clause applies to *all* capital sentencing proceedings, regardless of whether a jurisdiction chooses to employ jury sentencing.

Finally, several states, including Texas, allow jury sentencing in noncapital cases. *See* TEX. CODE CRIM. P. ANN. art. 37.07 § 2(b); ARK. CODE. ANN. § 16-90-107(b)(1); KY. REV. STAT. ANN. § 532.055(2); MO. ANN. STAT. § 557.036; VA. CODE ANN. § 19.2-295. As we have noted at length, however, the Confrontation Clause does not apply at noncapital sentencing. The dissent does not explain why jury sentencing should result in the attachment of the confrontation right at capital sentencing even though that link-up does not exist at noncapital sentencing.

24

The dissent goes on to state that at the time of the Founding, "cases suggest that judges conducted noncapital sentencing in informal proceedings featuring testimonial hearsay." Therefore, according to the dissent, "[h]istory supports constraining confrontation rights in noncapital sentencing, but capital sentencing has a different history that suggests the Confrontation Clause should apply."

This logic is flawed. The Framers did *not* know of an institution analogous to our capital sentencing procedure, because there was no mechanism in the trials that operated as so-called "*de facto* sentencing proceedings*" for the exercise of discretion even after a jury determined that a defendant was eligible for the death penalty by convicting him of a capital felony. A sentencing authority's ability to select a lesser punishment in a capital case in spite of death-eligibility is indeed a "post-constitutional" phenomenon, and nothing in the history related by the dissent explains why the presumption should not be as follows: Now that capital sentencing includes such discretion, the exercise of it should be treated in the same manner in which the Framers understood discretionary sentencing in the noncapital context to be treated with respect to the use of testimonial hearsay.

Neither the text of the Sixth Amendment nor the history of murder trials supports the extension of the Confrontation Clause to testimony relevant only to penalty selection in a capital case.

Furthermore, the manner in which the Supreme Court has proceeded in applying (*vel non*) Sixth Amendment rights during sentencing proceedings suggests there is no distinction between capital and ordinary sentencing for Sixth Amendment purposes, and accordingly the Court provides no indication that the reasoning of *Williams* has been abandoned in the capital context.

<u>ii.   The Eighth Amendment</u>

The Court's Eighth Amendment jurisprudence likewise does not dictate that capital sentencing should be treated differently from ordinary sentencing with regard to the application of the Confrontation Clause.  Rather, the Court's emphasis on individualized sentencing in its Eighth Amendment decisions lends support to the animating principle behind *Williams*:  When it comes to sentencing, the more information available for consideration by the sentencing authority, the more confidence we can have in the appropriateness of the sentence.

The dissent asserts that

[t]he stringent "trial-like" procedures that govern capital sentencing derive from the Supreme Court's unique concern with reliability in death penalty cases.  "In capital proceedings generally, th[e] Court has demanded that factfinding procedures aspire to a heightened standard of reliability.  This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (internal citations omitted). Confrontation is essential to reliability.

Notably absent from the passage the dissent pulls from *Ford* is the

citation the Court uses to support the notion that capital "fact-finding procedures aspire to a heightened standard of reliability." The *Ford* Court pointed to *Spaziano*, wherein it had opined that

> [t]he absence of a lesser included offense instruction increases the risk that the jury will convict, not be-cause it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free. In *Beck* [*v. Alabama,* 447 U.S. 625 (1980)], the Court found that risk unacceptable and inconsistent with the reliability this Court has demanded in capital pro-ceedings. The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence. Requiring that the jury be instructed on lesser included offenses for which the defendant may not be convicted, however, would simply introduce another type of distor-tion into the factfinding process. We reaffirm our commitment to the demands of reliability in decisions in-volving death and to the defendant's right to the benefit of a lesser included offense instruction that may reduce the risk of unwarranted capital convictions.

*Spaziano*, 468 U.S. at 455-56.

Importantly, as *Spaziano* indicates, where the Court discusses the need for reliability in the Eighth Amendment context, it is not talking about the appropriate sources for information introduced at sentencing or even, more generally, about the reliability of evi-dence. It is instead focusing on (1) the need to delineate, *ex ante*, the particular offenses for which death is a proportionate punishment and (2) the need for the jury to be able to consider all factors (particularly mitigating, but also aggravating) relevant to choosing an appropriate punishment once the death penalty is in play. Reliable death sentences, under the Eighth Amendment, are

those that result from a sentencing scheme that guards against arbitrariness by streamlining discretion at the eligibility stage, and then allows for the exercise of wide-ranging discretion at the selection stage.

In chastising a defendant for failing to recognize the "differing constitutional treatment" accorded to the eligibility and selection phases of capital sentencing, the Court has stated that "[i]t is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition." *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998). With regard to the selection decision, the Court in *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976), stated that "[b]ecause of [the] qualitative difference [between death and imprisonment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

The Court explained that the need for greater reliability in the selection of an appropriate punishment entails *not* stricter evidentiary rules, but the assurance of "individualized sentencing" once a defendant is eligible for the death penalty:

> Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249 . . .; *Furman v. Georgia*, 408 U.S., at 402-403 . . . (Burger, C.J., dissenting). While the prevailing practice of individu-

28

alizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, *see Trop v. Dulles*, 356 U.S., at 100 . . . (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

*Id.* at 304. Likewise, in *Gregg v. Georgia*, 428 U.S. 153, 203 (1976), the Court rejected a constitutional challenge to "the wide scope of evidence and argument allowed at presentence hearings."

We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

*Id.* at 203-04.

All of this is not to suggest that evidentiary reliability is unimportant at capital sentencing. Rather, the salient point is that the particular reliability concern that distinguishes capital sentencing from ordinary sentencing under the Eighth Amendment is not evidentiary reliability.

Evidentiary reliability surely *is* important at capital sentencing, just as it is at noncapital sentencing.[23] The Supreme

---

[23] *Compare, e.g., United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999) (stating that under the FDPA, "the defendant and the government may introduce any relevant information
(continued...)

29

Court's Eighth Amendment jurisprudence, however, does not make evidentiary reliability any *more* important at capital sentencing than it is at noncapital sentencing, where the Confrontation Clause does not apply.

A defendant in any sentencing proceeding must be given the opportunity to "deny or explain" the evidence against him, and *Crawford* does not suggest that confrontation is the only mechanism through which the reliability of testimony can be assessed. *Cf. Whorton v. Bockting*, 127 S. Ct. 1173, 1183 (2007). Rather, *Crawford* stands for the proposition that, *where the clause applies*, confrontation is the only *permissible* method of assessing reliability:

> To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.

*Crawford*, 541 U.S. at 61.

Our conclusionSSthat the Confrontation Clause is inapplicable to the presentation of testimony relevant only to the sentencing

---

[23](...continued) during the sentencing hearing limited by the caveat that such information be relevant, reliable, and its probative value must outweigh the danger of unfair prejudice") *with* U.S.S.G. § 6A.1.3 (providing that "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy").

30

authority's selection decisionSSdoes not doom defendants to being sentenced to death on the basis of unreliable hearsay evidence. "Although the Confrontation Clause does not apply at sentencing proceedings, this is not to say that there are no constitutional limitations on the use of hearsay evidence at such proceedings. A defendant may not be sentenced on the basis of 'misinformation of constitutional magnitude.'" *Wise*, 976 F.2d at 402 (citing *Tucker*, 404 U.S. at 447). Accordingly, "[d]ue process requires that some minimal indicia of reliability accompany a hearsay statement," *United States v. Petty*, 982 F.2d 1365, 1369 (9th Cir. 1993), and "a significant possibility of misinformation justifies the sentencing court in requiring the Government to verify the [hearsay] informa-tion," *Fatico*, 579 F.2d at 712-13.

The FDPA in particular sets up a procedural framework at capi-tal sentencing that adequately balances (1) the requisite access to a wide range of information to achieve individualized sentences and (2) the need to protect defendants from being sentenced on the ba-sis of "misinformation of a constitutional magnitude." Though the FDPA states that the Federal Rules of Evidence do not apply at cap-ital sentencing, it also provides that a defendant may rebut any information received at a hearing and must be given a fair oppor-tunity to present argument as to the adequacy of the information presented to establish the existence of any aggravating or miti-gating factor. 18 U.S.C. § 3593(c). Additionally, under the FDPA

31

a sentencing judge may exclude information if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

### e. Conclusion

Based on the foregoing, the principles underlying *Williams* are relevant, persuasive, and ultimately fatal to Fields's Confrontation Clause challenge. Given the particular importance of individualized sentences in capital cases, we will not "freez[e] the evidential procedure of sentencing in the mold of trial procedure," *Williams*, 337 U.S. at 251, where, as here, challenged testimony is relevant only to a sentencing authority's selection decision. The district court did not err in admitting the challenged statements.

### 2. *ALLEN* CHARGE

About five hours after sentencing deliberations began, the jury sent a note asking "[i]f we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the court have for punishment?" The court responded, without objection, "[y]ou are instructed on page 16 of the Punishment Phase Charge of the Court as follows: 'If you are unable to unanimously agree on either punishment option, the Court will impose punishment, which cannot be a sentence of death.' Beyond that, I am unable to answer your question."

Forty minutes later the jury sent a note stating that "[w]e cannot come to a unanimous agreement." The court responded with

32

the supplemental instruction "[p]lease continue your delibera-
tions." *Id*. Approximately one hour later the jury returned a un-
animous sentence of death.

Fields claims the supplemental instruction, to which he did
not have the opportunity to object in the district court, impermis-
sibly coerced a verdict of death. We review for abuse of discre-
tion supplemental instructions telling a jury to continue deliber-
ating. *See United States v. Straach*, 987 F.2d 232, 243 & n.13 (5th
Cir. 1989).

In *Allen v. United States*, 164 U.S. 492, 501 (1896), the
Court stated that "[t]he very object of the jury system is to se-
cure unanimity by a comparison of views, and by arguments among the
jurors themselves." If a jury is having difficulty reaching a un-
animous verdict, it is permissible to instruct it

> that in a large proportion of cases absolute certainty
> could not be expected; that, although the verdict must be
> the verdict of each individual juror, and not a mere ac-
> quiescence in the conclusion of his fellows, yet they
> should examine the question submitted with candor, and
> with a proper regard and deference to the opinions of
> each other; that it was their duty to decide the case if
> they could conscientiously do so; that they should lis-
> ten, with a disposition to be convinced, to each other's
> arguments; that, if much the larger number were for con-
> viction, a dissenting juror should consider whether his
> doubt was a reasonable one which made no impression upon
> the minds of so many men, equally honest, equally intel-
> ligent with himself. If, on the other hand, the majority
> were for acquittal, the minority ought to ask themselves
> whether they might not reasonably doubt the correctness
> of a judgment which was not concurred in by the majority.

*Id*. Any similar supplemental instruction that urges members of a

deadlocked jury to forego their differences is now known as an "*Allen* charge," or "the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge." *United States v. Bailey*, 468 F.2d 652, 666 (5th Cir. 1972). This "standard supplemental instruction has been well-received by the nation's trial court judges. The charge is used precisely because it works, because it can blast a verdict out of a jury otherwise unable to agree that a person is guilty." *Id.*

Fields contends that the instruction "[p]lease continue your deliberations" is impermissible because it contained none of the protective language of the traditional *Allen* charge, telling jurors not to forego their conscientiously-held views. The government contends, to the contrary, that the supplemental instruction is permissible because it contains none of the "dynamite" language of the traditional *Allen* charge, urging minority jurors to reconsider their views. In the absence of "dynamite" language, the government asserts, protective language is unnecessary.

We "scrutinize the *Allen* charge for compliance with two requirements: (1) the semantic deviation from approved *Allen* charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved *Allen* charge must not be coercive." *United States v. Lindell*, 881 F.2d 1313, 1321 (5th Cir. 1989) (internal citations and quotations omitted). Our decision in *Straach* forecloses Fields's argument

34

that the variation on the *Allen* charge was unfairly prejudicial and coercive.

In *Straach* we considered the following charge given to a dead-locked jury: "'Considering the length of the trial and the amount of the evidence to be considered, the Court requests that you continue your deliberations in an effort to reach a verdict on all counts.'" 987 F.2d at 243. Finding no abuse of discretion, we stated that

> [t]he note did not coerce the minority jury members into agreement with the majority, or set a time limit on deliberations. The note expressed no opinion as to what kind of verdict the court preferred . . . . Of course, the phrase "considering the length of the trial and the amount of the evidence to be considered" might have been read by a juror to mean that the result should be obvious to all jurors upon due consideration of the evidence. However, it remains difficult to construe the note as coercive or as favoring a particular verdict, insofar as it simply urged that "an effort" be made to reach a unanimous verdict. Thus, *even if the note's language deviated in some respects from that of previously approved* Allen *charges*, it was acceptable.

*Id.* (emphasis added). The instruction here, similar to the one in *Straach*, is arguably even less problematic than the one upheld there, because the instant instruction contains no language in any way suggesting that "the result should be obvious."

Fields's attempt to distinguish *Straach* on the ground that the supplemental instruction in this case told jurors to "keep deliberating," without any language indicating that only "an effort" need be made, is unpersuasive. Without setting any time limit on deliberations or indicating that a verdict must be reached, the idea

35

that only "an effort" is required is implicit in the simple instruction to "continue deliberations," particularly considering that the jury had been deliberating for only six hours when the instruction was given.

Finally, contrary to Fields's suggestion, the fact that the jury handed down a unanimous sentence of death approximately one hour after receiving the supplemental instruction does not indicate that the instruction was coercive. In *Montoya v. Scott*, 65 F.3d 405, 409-10 (5th Cir. 1995), we found no coercion even where the jury returned its verdict within forty minutes of receiving the challenged supplemental instruction. On the basis of *Straach*, the district court did not abuse its discretion in instructing the jury to continue its deliberations.

### 3. GOVERNMENT'S CLOSING ARGUMENT

In the government's closing argument at sentencing, the prosecutor employed a televisual "picture in picture" metaphor, telling the jury to imagine that Fields's activities before, during, and after Coleman's murder were playing on one screen, while Coleman's activities before and at the time of her murder were playing on the other. Fields did not object to the manner or content of the prosecutor's discussion. He asserts, for the first time on appeal, that the district court violated his due process and Eighth Amendment rights by allowing the government to use this metaphor. Additionally, he argues that the government's use of the metaphor re-

36

sulted in a sentence based in part on "passion, prejudice, or other arbitrary factor," in violation of 18 U.S.C. § 3595(c)(2)(A).

"As a general rule, constitutional and other legal questions are reviewed *de novo*." *United States v. Delgado-Nunez*, 295 F.3d 494, 496 (5th Cir. 2002) (internal citations and quotations omitted). Claims of error not preserved at trial, however, are reviewed for plain error only. FED. R. CRIM. P. 52(b).

Fields claims that comparative worth arguments that encourage the jury to compare the value of the victim's life with the defendant's are impermissible under *Payne v. Tennessee*, 501 U.S. 808 (1991). In *Payne*, however, the Court held only that the Eighth Amendment does not erect a *per se* bar to victim impact evidence and that such evidence is admissible unless it is "so unduly prejudicial that it renders the trial fundamentally unfair." *Id*. at 825.

With regard to comparative worth arguments, the Court stated only that the "concern . . . that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy" is largely unwarranted, because victim impact evidence is rarely offered for such a purpose. *Id*. at 823.

Thus, to the extent that the Court expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not victim-to-defendant comparisons. In-

deed, in *Humphries v. Ozmint*, 397 F.3d 206, 224 n.8 (4th Cir.), *cert. denied*, 126 S. Ct. 128 (2005), the court noted that *Payne* does not foreclose victim-defendant comparisons; it suggested that "[a] victim-to-victim comparison is more pernicious than a victim-to-defendant comparison because, not only does it invite a commentary on collateral evidence not properly before the jury (the worthiness of other members (victims) of society), it does not counteract the defendant's mitigating evidence, which was one of the main goals of *Payne*."

Given that victim impact evidence and evidence of a defendant's character (both positive and negative) are admissible at capital sentencing, it is difficult to discern how the prosecutor's use of the picture-in-picture metaphor violated Fields's constitutional and/or statutory rights. The purpose of the metaphor, aside from establishing a chronology of events, was to highlight the non-statutory aggravating factors the government was trying (and is permitted) to establish: that Coleman was the mother of a newborn who needed her attention and that Fields is a consistently violent man who cruelly took her life away. Accordingly, there is no error, let alone plain error, in allowing the government to present its closing argument as it did.

### 4.  EXPERT TESTIMONY ON FUTURE DANGEROUSNESS

Fields claims that introducing certain expert psychiatric testimony on the issue of future dangerousness constituted error.

### a. Statutory Challenge

Fields contends that the district court committed statutory error in admitting the expert testimony of a forensic psychiatrist, Dr. Coons, during the punishment phase of trial. Our review is for abuse of discretion. *See Hall*, 152 F.3d at 402.

### i. Background

Prior to Dr. Coons testifying, Fields moved to examine him outside the presence of the jury to make a challenge pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993). The court granted Fields's motion to examine Dr. Coons regarding the reliability of predicting future dangerousness. However, the court ultimately overruled Fields's objections and allowed the Government to call Dr. Coons to testify.

After Dr. Coons testified regarding his education and experience, the prosecutor posed a hypothetical, which consisted of the facts of the instant capital murder and some of Fields's background and criminal history. Based upon this hypothetical, the prosecutor asked Dr. Coons whether such an individual would constitute a future danger to others, including persons in a correctional facility. Dr. Coons responded that there was a "probability of future violence."

### ii. Analysis

On appeal, Fields makes clear that he is not arguing that psychiatric predictions of future dangerousness during the pun-

ishment phase are inadmissible *per se.* Instead, he states that the "question is whether the evidence before the trial court on *this* record reflected a showing of reliability sufficient to support the admission *as expert opinion* of Dr. Coons's admittedly subjective and nonscientific prediction about Fields's future dangerousness."

<u>(1) *Daubert* Does Not Apply</u>

We first address the argument that standards governing the admissibility of expert evidence at trial should also govern, either strictly or loosely, at capital sentencing. Federal Rule of Evidence 702 provides that expert evidence is admissible if, *inter alia*, it "is the product of reliable principles and methods" that are applied "reliably to the facts of the case." In *Daubert,* the Supreme Court held that Rule 702 superseded the requirement of general acceptance for admission of scientific expert testimony. *See* 509 U.S. 579. "Under *Daubert,* the district court conducts a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *United States v. Norris,* 217 F.3d 262, 269 (5th Cir. 2000) (quoting *Daubert,* 509 U.S. at 592-93) (also citing FED. R. EVID. 702). *Daubert* "provides an illustrative list of factors that may aid a court in evaluating reliability." *Mathis v. Exxon*, 302

F.3d 448, 460 (5th Cir. 2002).[24]

The *amicus curiae* in this case, the American Psychological Association, urges that we formally adopt the *Daubert* reliability factors for determining the admissibility of expert evidence in federal death penalty sentencing hearings. Similarly, Fields argues that a district court must apply *Daubert* or conduct a quasi-*Daubert* inquiry when deciding whether to admit proffered expert testimony at the punishment phase of a federal capital murder trial. Fields contends that although the *Daubert* test "may not apply by its own terms under the FDPA, . . . the same principles necessarily inform the inquiry whether proffered evidence meets the applicable statutory requirements, as well as the overarching constitutional command of 'heightened reliability.'" We reject both positions.

No Circuit that we are aware of has applied *Daubert* to sentencing.[25] Moreover, as Fields acknowledges, the FDPA provides

---

[24] Those factors are "(1) whether the expert's theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community." *Mathis*, 302 F.3d at 460.

[25] *See United States v. Barnette,* 211 F.3d 803, 815 (4th Cir. 2000) ("We need not address whether *Daubert* applies to sentencing hearings, because, even assuming that it does, we find the evidence meets its standard for admissibility."); *see also Flores v. Johnson,* 210 F.3d 456, 464-70 (5th Cir. 2000) (specially concurring, Garza, J.) (questioning the constitutionality of admitting an expert's testimony regarding
(continued...)

that evidence may be admitted "regardless of its admissibility under the rules governing admission of evidence at criminal trials." 18 U.S.C. § 3593(c) (emphasis added). The FDPA by its terms does not fully implement the Federal Rules of Evidence at the punishment phase. Since *Daubert*'s holding was based on the Federal Rules of Evidence, it is not directly applicable.

That does not entirely answer the question as to whether some quasi-*Daubert* inquiry is required to satisfy the FDPA. Fields argues that other parts of the FDPA should inform our inquiry, specifically pointing to section 3593(c) that provides that Dr. Coons's testimony *may* be excluded if Fields has shown that its "probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."[26] We are somewhat sympathetic to the argument, but ultimately cannot read a provision into the FDPA that evaluating the probative value of expert testimony for sentencing purposes requires a form of *Daubert* hearing. Fields cannot point us to where such a requirement appears, even implicitly, in the text, history or logic of the FDPA. His statutory argument is unavailing and is better couched as a

_____

[25](...continued)
future dangerousness after *Daubert*); *cf. Tigner v. Cockrell,* 264 F.3d 521, 526–27 (5th Cir. 2001) (declining an invitation to hold that *Daubert* required the exclusion of expert future dangerousness testimony because it would constitute a new rule on collateral review).

[26] The language of section 3593(c) is very similar to Rule 403 of the Federal Rules of Evidence except that Rule 403 provides that evidence may be excluded if the probative value is *substantially* outweighed by, among other things, the danger of unfair prejudice.

constitutional claim based in the Eighth and Fifth Amendments.  Unfortunately for Fields, that constitutional argument is foreclosed and it is beyond our power to revisit it.  *See* Part II.A.2.b.

### (2) *Barefoot v. Estelle*'s Logic Undermines Fields's General Reliability Argument

Fields also argues more generally under section 3593(c) that, if Dr. Coons's testimony is shown to be unreliable, the "evidence cannot assist the jury as it is plainly not 'probative' of anything."  We are not persuaded by this argument.

"The Federal Death Penalty Act . . . erects very low barriers to the admission of evidence at capital sentencing hearings.  Since the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase of trial, parties may present evidence 'as to any matter relevant to the sentence.'"[27] *United States v. Lee,* 274 F.3d 485, 494 (8th Cir. 2001) (quoting 18 U.S.C. § 3593(c)).  As noted above, the sole statutory restriction is that evidence may be excluded if it is more prejudicial than probative.

The seminal case regarding whether expert testimony is reliable and should be allowed with respect to future dangerousness predictions during the punishment phase of a capital murder trial is *Barefoot v. Estelle*, 463 U.S. 880 (1983).  Although *Barefoot* involved a constitutional challenge on collateral review and thus

---

[27] To say the scope of valid sentencing evidence is broader does not necessarily signify that the form testimony may take should be looser.  "The FDPA expressly supplants only the rules of evidence, not constitutional standards."  *United States v. Johnson*, 239 F. Supp. 2d 924, 946 (N.D. Iowa 2003).

is not technically controlling, the Supreme Court's reasoning certainly must inform our analysis of this related issue. Ultimately, *Barefoot*'s sweeping logic requires us to reject Fields's general reliability argument.

In *Barefoot*, the petitioner argued that the testimony of two psychiatrists regarding his future dangerousness during the punishment phase of his state capital murder trial was unconstitutional. Barefoot broadly argued that psychiatrists (1) were incompetent to predict future dangerousness to an acceptable degree of reliability and (2) should not be permitted to testify regarding future dangerousness in response to a hypothetical or without examining the defendant. *Id.* at 896. He also argued that his death sentence should be set aside because the testimony was unreliable under the particular circumstances of his case. The Supreme Court rejected all his arguments. *Id.*

With respect to the argument that no psychiatrist should testify as to the future dangerousness of a defendant, the Supreme Court explained that such a rule "is contrary to our cases." *Id.* Because predicting future dangerousness "is a constitutionally acceptable criterion for imposing the death penalty," and it is "not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that

44

they should not be permitted to testify." *Id.* at 896-97 (citing *Jurek v. Texas,* 428 U.S. 262 (1976)); *see also Estelle v. Smith,* 451 U.S. at 473 (reiterating the validity of *Jurek* and in "no sense disapproving the use of psychiatric testimony bearing on the issue of future dangerousness").

Additionally, the Court reasoned that, to accept Barefoot's argument that expert testimony predicting future dangerousness "is far too unreliable to be admissible would immediately call into question those other contexts in which predictions of future behavior are constantly made." *Barefoot*, 463 U.S. at 898; *see, e.g.*, *O'Connor v. Donaldson,* 422 U.S. 563 (1975) (explaining that expert psychiatrists and psychologists interpret facts that determine whether an individual is dangerous to himself or others and in need of civil commitment). The Court further explained that expert testimony regarding future dangerousness "may be countered not only as erroneous in a particular case but also as generally so unreliable that it should be ignored." *Barefoot*, 463 U.S. at 898.

Similarly, the *Barefoot* Court refused to accept the American Psychiatric Association's position in its *amicus* brief that such expert testimony should be barred as unreliable because it was in error "most of the time." *Id.* at 901. Noting that it had rejected the same view in *Estelle v. Smith,* the Court was "not persuaded that such testimony is almost entirely unreliable and that the fact-finder and the adversary system will not be competent

45

to uncover, recognize, and take due account of its shortcomings." *Id.* at 899.

The Supreme Court also rejected Barefoot's argument that future dangerousness testimony should be based upon personal examination rather than hypotheticals. The Court recognized that expert testimony, including responses to hypotheticals, was routinely admitted if it assisted the factfinder. *Id.* at 903. It further observed that neither the extant Federal Rules of Evidence nor state law lent support to the argument that the use of hypotheticals was unconstitutional. *Id.* at 904–05.

Finally, Barefoot asserted that the use of hypotheticals in his case violated due process of law. *Id.* at 904. The Supreme Court summarily found no constitutional violation. The Supreme Court stated that "to agree with petitioner's *basic position* would seriously undermine and in effect overrule *Jurek*," and it was not inclined to do so. *Id*. at 906 (emphasis added).[28]

As previously set forth, although we recognize that *Barefoot* involved a constitutional challenge, its reasoning informs us in assessing the instant case. Indeed, Fields's statutory argument is

---

[28] A recent opinion by Justice Stevens confirmed the breadth and continuing viability of *Barefoot. See United States v. Scheffer*, 523 U.S. 303, 334 (1998) (Stevens, J., dissenting) ("There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible. Expert testimony about a defendant's 'future dangerousness' to determine his eligibility for the death penalty, *even if wrong 'most of the time,' is routinely admitted*.") (emphasis added). No member of the *Scheffer* Court disagreed.

46

laced with references to the heightened reliability requirement under the Eighth Amendment.  In addition, the *Barefoot* Court's pragmatic concerns about rejecting future dangerousness testimony apply equally here.  Furthermore, the arguments urged today§§though framed formally in statutory terms§§are similar in substance to the ones rejected in *Barefoot*.  For example, the *amicus* in *Barefoot*, like the *amicus* here, argued that the future dangerousness methods in issue could be in error most of the time.  Likewise, both Fields and Barefoot challenged the experts' testimony based upon the failure to personally examine the defendant and the use of hypotheticals.  The logic of *Barefoot* meets these challenges.

In the instant case, Dr. Coons's testimony was probative because Fields's jury was required to make an assessment of future dangerousness and because the jury could benefit from the opinion of a psychological expert on that matter.  Moreover, as *Barefoot* noted, the adversarial system reduces any prejudicial unreliability in future dangerousness expert testimony because it can expose the flaws in such testimony.  For these reasons, we reject the claim that Dr. Coons's testimony was so unreliable that the district court abused its discretion[29] by admitting it.[30]

---

[29] Since our review is deferential, we need not address whether a district court could opt to exclude future dangerousness testimony on reliability grounds.  We hold only that it was not an abuse of discretion to admit such testimony.

[30] Fields makes three final arguments which require little discussion.  His claims that the testimony at issue (1) invaded the

(continued...)

47

### b. Constitutional Challenge

Fields also claims that the admission of Dr. Coons's testimony regarding future dangerousness during the punishment phase violated his rights under the Eighth and Fifth Amendments. *Barefoot* fore- closes this claim. As to Fields's argument that *Barefoot* should be revisited, it is the Supreme Court's prerogative, not ours, to con- sider revisiting its precedent. *See, e.g.*, *Rodriguez de Quijas v. Shearson/Am. Express*, 490 U.S. 477, 484 (1989).

### 5. PROOF BEYOND A REASONABLE DOUBT AND THE WEIGHING PROCESS

In Fields's final claim of sentencing error, he seeks to extend the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). Specifically, he argues that the FDPA violates the Sixth Amendment, as construed in *Ring*, because it does not require the jury to apply the reasonable doubt standard in deciding whether the aggravating factors outweigh the mitigators.

In *Ring*, the Supreme Court applied *Apprendi v. New Jersey* to capital cases. It reiterated, "If [Congress] makes an increase in a defendant's authorized punishment contingent on [a] finding of a

---

[30](...continued) province of the jury or (2) would be "unfairly prejudicial" even if reliable have no merit. Additionally, we reject Fields's complaint that the court abused its discretion by not articulating on the record its balance of probative value and unfair prejudice under section 3593(c). Assuming *arguendo* that such an articulation would be required in the context of section 3593(c), Fields's "failure to request specifically an on-the-record articulation . . . is fatal to his appeal on this point." *United States v. Fox*, 69 F.3d 15, 20 (5th Cir. 1995) (Rule 404(b)).

fact, that fact—no matter how [Congress] labels it—must be found by a jury beyond a reasonable doubt."  536 U.S. at 602 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 482–83 (2000)).  Contrary to Fields's contention, this rule does not require the jury to apply the reasonable doubt standard during the weighing process.

The *Apprendi/Ring* rule does not extend to the ultimate decision whether to impose the death penalty.  Capital defendants have no constitutional right to a jury at sentencing.  *See Proffitt v. Florida*, 428 U.S. 242, 252 (1976) (plurality opinion).  Indeed, the Supreme Court has explicitly held that judges may do the weighing of aggravating and mitigating circumstances consistent with the Constitution.  *See Clemons v. Mississippi*, 494 U.S. 738, 745 (1990).  The Court's *Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to the right to jury trial.[31]  Since the Constitution does not require a jury to do the

---

[31] This was recently explained, in the context of the United States Sentencing Guidelines, by the en banc Third Circuit:

> None of the facts relevant to enhancements or departures under the Guidelines can increase the maximum punishment to which the defendant is exposed.  The *Due Process Clause* thus affords no right to have these facts proved beyond a reasonable doubt. *Harris [v. United States]*, 536 U.S. [545,] 558 [(2002)] ("Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the . . . reasonable-doubt component[] of the Fifth . . . Amendment[].").  This holding accords with the decisions of each of our sister circuits that has addressed this issue.

*United States v. Grier*, 475 F.3d 556, 566 (3d Cir. 2007) (en  banc) (some citations omitted, some brackets and ellipses in original).

weighing, we cannot conclude that the showing required must be proof beyond a reasonable doubt.

Moreover, the *Apprendi/Ring* rule should not apply here because the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a "highly subjective," "largely moral judgment" "regarding the punishment that a particular person deserves . . . ." *Caldwell v. Mississippi*, 472 U.S. 320, 340 n.7 (1985). In death cases, "the sentence imposed at the penalty stage . . . reflect[s] a reasoned *moral* response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (emphasis in original). The *Apprendi/Ring* rule applies by its terms only to findings of fact, not to moral judgments. *See Ring*, 536 U.S. at 602.

The Supreme Court's reasoning in *Kansas v. Marsh*, 126 S. Ct. 2516 (2006), supports our conclusion. In *Marsh*, the Court construed a previous decision, *Walton v. Arizona*, 497 U.S. 639 (1990), as holding "that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances." *Marsh*, 126 S. Ct. at 2524. Additionally, in a concurring opinion in *Marsh*, Justice Scalia recognized that the Constitution does not require a reasonable doubt standard as to the weighing process: "[T]he State could, as Marsh freely admits, [adopt a] scheme requiring the State to prove *by a mere*

50

*preponderance of the evidence* that the aggravators outweigh the mitigators." *Id.* at 2532 n.2. No member of the *Marsh* Court disagreed. Accordingly, we hold that the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt.

## B. CLAIMS OF TRIAL ERROR

We first address Fields's arguments that the district court committed error that requires reversal of his convictions. Ultimately, we affirm each conviction.

### 1. FAILURE TO CONSULT PUBLIC DEFENDER ON APPOINTED COUNSEL

Fields's first guilt-phase claim is that the district court erred by failing to secure the advice of the Federal Public Defender ("FPD") before appointing him capital counsel. The appointment of counsel to represent indigent defendants in capital cases is governed by 18 U.S.C. § 3005. It provides that those charged with federal capital offenses are entitled to two lawyers, one of whom "shall be learned in the law applicable to capital cases." Section 3005 further requires: "In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts."

#### a. Background

After Fields was charged with a capital offense, his attorney, Scott Peterson, filed a motion pursuant to section 3005 asking the court to appoint a second attorney learned in the law of capital cases. Attorney Peterson advised the court that Rob Swanton had agreed to be co-counsel. The court stated that Swanton was "more than acceptable" because he was "an excellent, excellent attorney." Two days later, the court entered an order formally appointing Swanton as lead counsel. It found, "Mr. Swanton is learned in the law applicable to capital cases and is qualified to appear as counsel because of his distinguished prior experience in the trial of death-penalty cases." Fields made no objection either to the court's decision to appoint Swanton or to its failure to consult the FPD before so deciding.

After trial, Fields moved to supplement the appellate record with the affidavit of Lucien Campbell, the Federal Public Defender for the Western District of Texas. In the affidavit, Campbell stated that the district court did not request his recommendation for the appointment of counsel. The court granted the motion to supplement and acknowledged on the record that it did not confer with the FPD. It also stated, "Scott Peterson and Rob Swanton were appointed to represent Mr. Fields because of their years of experience in the criminal defense field, including numerous capital cases. Additionally, Mr. Peterson was the Defendant's attorney of record on the original federal gun case for which he was in jail at the time of his escape."

### b.  Standard of Review

Fields contends that we should review *de novo* even though he raises the court's noncompliance with section 3005 for the first time on appeal.  However, a contemporaneous objection ordinarily is required to preserve error.  *See United States v. Olano*, 507 U.S. 725, 731 (1993).  None of Fields's arguments provides justification for us to deviate from that general rule.  Section 3005 came into play, at the earliest, only after the Government charged Fields with a capital offense.  By that time, Fields already was repre-sented by counsel, Attorney Peterson. Fields had ample opportunity to object below through his attorney on the grounds he now asserts. Since he failed to do so, we review his claim for plain error. Fields can only prevail if he shows "that (1) there is an error, and that the error (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *See United States v. Garza*, 429 F.3d 165, 169 (5th  Cir. 2005), *cert. denied*, 126 S. Ct. 1444 (2006).

### c.  Analysis

Assuming *arguendo* that Fields's claim would succeed on the first two prongs of plain-error review, it fails on the third prong.  Fields cannot show prejudice.  He acknowledges that the purpose of securing the FPD's recommendation is to ensure the high-quality representation necessary in capital cases.  *See United*

53

*States v. Shepherd*, 576 F.2d 719, 728–29 (7th Cir. 1978).  He does not argue, however, that the district court erred in determining that Swanton was an "excellent" attorney who was learned in the law of capital defense (indeed "distinguished") or that the court incorrectly found that both his attorneys, Swanton and Peterson, had each tried numerous capital cases through years of experience in the field of criminal defense.  Thus, Fields cannot show that the error affected his substantial rights.[32]

Unable to show actual prejudice, Fields argues that no such showing should be required due to the "fundamentally structural character of the error."  The Supreme Court has indicated that the structural error doctrine applies only in a "very limited class of cases." *Neder v. United States*, 527 U.S. 1, 8 (1999).  Only errors that "undermin[e] the fairness of a criminal proceeding as a whole . . . require[] reversal without regard to the mistake's effect on the proceeding." *See United States v. Dominguez-Benitez*, 542 U.S.

---

[32] Insofar as Fields suggests that either Swanton or Peterson may have been inadequate because neither had tried a case under the Federal Death Penalty Act, that argument is without merit.  Section 3005 makes no state/federal distinction, and the guide to Federal Death Penalty cases promulgated by the Judicial Conference expressly rejects such a distinction. *See Guide to Judiciary Policies and Procedures*, App. I-1 (1999) ("Ordinarily, 'learned counsel' should have distinguished prior experience in the trial, appeal, or postconviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review.") (emphasis in original).  Indeed, as a practical matter, state courts often are the only place that attorneys can gain significant capital experience. *See id*. at I-10 ("Because violent felony offenses, particularly homicides, rarely are prosecuted in the federal courts, there is little opportunity for federal court practitioners to learn even the fundamentals relevant to the guilt phase defense of a federal death penalty case.").

74, 81 (2004). The statutory error asserted here is not so fundamental. Additionally, there is no "strong support" in the operable statute to suggest an "implied repeal" of Federal Rule of Criminal Procedure 52, which requires us to disregard errors that do not affect substantial rights. *See Zedner v. United States*, 126 S. Ct. 1976, 1989 (2006).

In support of his argument that the error here is structural, Fields cites a line of Fourth Circuit cases. *See, e.g.*, *United States v. Williams*, 544 F.2d 1215, 1218 (4th Cir. 1976) (holding that failure to appoint second counsel under section 3005 "gives rise to an irrebuttable presumption of prejudice"). This line of cases is inapposite. They all involve district courts' failures to appoint any second counsel. Such an error is considerably more serious than what occurred here. Moreover, the Third Circuit has explicitly rejected the Fourth Circuit's presumed-prejudice approach to a court's failure to appoint second counsel. *See United States v. Casseus*, 282 F.3d 253, 256 n.1 (3d Cir. 2003). Without taking sides in this Circuit split, we decline to extend the Fourth Circuit's approach in the way Fields suggests. Accordingly, we reject Fields's claim that failing to consult the FPD before appointing capital counsel is structural error or that prejudice must be presumed. Since Fields cannot show prejudice, his claim fails.

## 2. CONFLICT OF INTEREST/WAIVER OF RIGHT TO COUNSEL

Fields makes two related arguments surrounding his trial attorney's alleged conflict of interest. He argues, first, that the district court's refusal to appoint unconflicted substitute counsel rendered his waiver of counsel involuntary.[33] Second, he contends that the district court neglected its "duty to inquire" about an apparent conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 347–48 (1980). The Government acknowledges that our review of these issues is *de novo*. *See United States v. Jones*, 421 F.3d 359, 362–63 (5th Cir. 2005).

### a. Background

As the trial date approached, Fields filed a request asking the trial court to appoint new counsel. He represented that "if the Court d[id] not allow him new trial counsel, that he intend[ed] to represent himself." Fields had threatened several times to invoke his right to represent himself but ultimately withdrew those motions. The district court held an *ex parte* hearing on Fields's latest motion.

At the hearing, Fields's lawyers informed the court that they had tried in vain to persuade Fields that going *pro se* would be a grave mistake. Additionally, Fields's lead attorney, Swanton, advised the court of "one other issue that's come up" concerning

---

[33] Otherwise, Fields's waiver of counsel appears to have been knowing and intelligent. In any event, Fields makes no argument to the contrary.

his co-counsel, Peterson:

> Back in 1987 . . .[,] there is a small entry in [Fields's] juvenile record that indicates Mr. Peterson[,] when he was working for the McLennan County district attorney's office[,] either authorized prosecution of Mr. Fields for a—if I remember it correctly, it was a burglary of a habitation case. I'm not sure that Mr. Peterson was actually directly involved in the prosecution. Frankly, Mr. Peterson cannot remember being involved in that, and it simply may be that somebody from the police or probation department called somebody at the D.A.'s office and asked for permission to file a petition. We have talked to Mr. Fields about that and while we don't really perceive it as a conflict, Mr. Peterson has certainly worked diligently on this case and that has never been an issue through the two years of representation. We talked to Mr. Fields about that and let him know that somebody somewhere down the line may see that as a perceived conflict of interest and that if he had any concerns about that, he should talk with the Court about it.
> . . . .
> We'd certainly be happy to offer information or testimony from Mr. Peterson if you thought that was necessary as to what he thinks his involvement was in that prosecution and put something on the record in that regard.

The entry to which Swanton referred states, "On 3-20-87 Scott Peterson, Assistant District Attorney, authorized the filing of a delinquency action against Sherman." Fields's juvenile record does not reflect any further involvement in the action by Peterson.

After Swanton's representation, the court allowed Fields to speak about his request to replace his attorneys. Fields expressed generalized "suspicio[n]s" that his attorneys were in league with the Government. He voiced disagreement with his attorneys' strategy, indicating that they were pursuing mitigation for the penalty phase "when I repeatedly profess my innocence." "Their strategy guarantees me the death penalty."

57

At a subsequent hearing, Fields expressed generically, "[M]y attorneys and I have a major conflict of interest . . . ." Fields never mentioned any specific concern that Peterson had authorized delinquency proceedings against him as a twelve-year-old. The district court did not seek further information concerning the purported conflict. Ultimately, the court denied Fields's request for new counsel and permitted him to proceed *pro se*.

### b. Analysis

#### i. Voluntariness of Waiver

##### (1) The Waiver Was Voluntary If There Was No Conflict of Interest

A court violates the Sixth Amendment if it allows a defendant to represent himself without first obtaining a valid waiver of counsel. *See, e.g.*, *United States v. Medina*, 161 F.3d 867, 870 (5th Cir. 1998). A defendant cannot be forced to choose between conflicted counsel and no counsel at all, and any waiver of counsel that results from those circumstances is not valid. *See Dunn v. Johnson*, 162 F.3d 302, 307 (5th Cir. 1998).

However, indigent defendants have no right to appointed counsel of their choice. *See, e.g.*, *United States v. Breeland*, 53 F.3d 100, 106 n.11 (5th Cir. 1995). Rather, "[a] defendant's refusal without good cause to proceed with able appointed counsel constitutes a voluntary waiver of that right." *Richardson v. Lucas*, 741 F.2d 753, 757 (5th Cir. 1984). "The question [of voluntariness] therefore boils down to whether [Fields] demonstrated good cause

for the substitution of assigned counsel." *McKee v. Harris*, 649 F.2d 927, 931 (2d Cir. 1981). One form of good cause for new counselSSthe only one relevant hereSSis to show that counsel labored under a conflict of interest. *See, e.g.*, *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973).

### (2) Insignificant or Insubstantial Conflicts Do Not Warrant Substitute Counsel

A district court need not appoint substitute counsel on conflict-of-interest grounds if it is "satisfied that any conflict does not risk compromising the defendant's representation." *United States v. Solomon*, 42 Fed. App'x 88, 91 (10th Cir. 2002) (unpublished).[34] As the Eighth Circuit has held, a defendant is only entitled to substitute counsel if the court finds significant interference with an existing attorney's "ability to provide zealous representation." *See United States v. Boone*, 437 F.3d 829, 839 (8th Cir.), *cert. denied*, 127 S. Ct. 172 (2006). This follows logically from the proposition that defendants are not entitled to appointed counsel of their choice. That rule would be rendered a nullity if insubstantial complaints entitled defendants to substitute counsel.

---

[34] *See Holloway v. Arkansas*, 435 U.S. 475, 484 (1978) (stating that courts need not appoint new counsel where the risk that a conflict will materialize is "remote"); *see also United States v. Exson*, 328 F.3d 456, 460 (6th Cir. 2003) ("The proper focus . . . is on the quality of the advocacy."); *Dunn*, 162 F.3d at 307 (stating that a defendant's waiver of counsel is voluntary unless existing counsel is "*constitutionally* inadequate") (emphasis added).

Indeed, the only precedent we have found touching the specific issue *sub judice*, *Dunn v. Johnson*, indicates that the conflict asserted must be significant to warrant substitute counsel. *See* 162 F.3d at 307. Dunn argued that his waiver of counsel was involuntary because his appointed attorneys had a conflict of interest. In support of this claim, Dunn asserted that, prior to his trial, he had filed a malpractice suit against his attorneys. We did not recognize this as a significant enough conflict of interest to render Dunn's waiver involuntary, pointing out that the "malpractice suit . . . had been dismissed as frivolous three years before his second trial." *Id.*[35]

### (3) The Conflict Alleged Was Not Serious Enough to Entitle Fields to New Counsel

Applying these principles to the case at bar, the supposed conflict of interest was not sufficiently substantial such that Fields was entitled to substitute counsel. Importantly, this is not a case where a defendant's attorney previously was actively involved in prosecuting the defendant. The record indicates that Attorney Peterson did nothing more than sign off summarily on a request to initiate delinquency proceedings against Fields. More-over, the juvenile adjudication occurred fifteen years before

---

[35] *Compare United States v. Creel*, 158 F.App'x 627, 628 (5th Cir. 2004) (unpublished) (defendant's "disagreements with counsel" did not "constitute[] good cause for him to receive a new attorney") *with Young*, 482 F.2d at 995 ("A showing that appellant's appointed attorney had disclosed confidential defense matters to the prosecutor which would damage the defense would have amounted to 'good cause' for not proceeding to trial with the same counsel.").

Fields's capital trial.  Also, it is important that Fields's counsel did not "perceive it as a conflict."  District courts reasonably may rely on defense counsel's assessment regarding the potential for conflict.  *See Holloway v. Arkansas*, 435 U.S. 475, 485 (1978) (stating that the appointed attorney "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial").

Our conclusion is bolstered by *Hernandez v. Johnson*, 108 F.3d 554, 558–61 (5th Cir. 1997), where we addressed a similar alleged conflict of interest.  In *Hernandez*, the defendant claimed that his lawyer had a conflict of interest because he previously had served "as the elected district attorney" when some of the defendant's prior convictions were obtained.  *Id*. at 558. During that service, Hernandez's attorney had "signed a motion requesting psychiatric evaluation of appellant . . ., signed a motion to dismiss a related indictment after Hernandez pled guilty, and . . . approved Hernandez's plea bargain."  *Id*. at 558–59.  We held that the attorney's previous involvement in Hernandez's prosecution was not "personal or substantial enough to give rise automatically to an actual conflict," reasoning that he was only "tenuously and nominally connected to the prior cases against Hernandez" and that the attorney's service for the state "ended nine years before." *Id*. at 560.  Likewise, Peterson's involvement was nominal and

61

tenuous, rather than personal or substantial.

Fields speculates, however, that Peterson may have "continued under a duty to the State of Texas not to undermine the finality and integrity of the prosecution he authorized against Fields." Since Peterson would have a duty in capital sentencing proceedings to attack Fields's past convictions, Fields reasons, this created a conflict of interest. There are at least three problems with this argument. First, we rejected a similar argument in *Hernandez*, a death-penalty case. Second, Fields cites no authority for the expansive duty he claims Peterson may have owed to Texas, whose service Peterson left long before Fields's trial. *See Spreitzer v. Peters*, 114 F.3d 1435, 1452 (7th Cir. 1997) (rejecting a conflict-of-interest claim where the attorney's "supposedly conflicting loyalty" to the Government was "extremely speculative and remote"). Third, Fields has given no indication that there was any good faith basis for attacking the juvenile adjudication at issue. Under the circumstances, Peterson did not labor under a conflict of interest substantial enough to significantly threaten his ability to provide Fields with effective representation. That being so, Fields's waiver of counsel was voluntary.[36]

### ii. Duty to Inquire

[36] For the first time in his reply brief, Fields argues that he accused his attorneys of misconduct, which gave rise to a conflict of interest. We will not consider this argument. Since it was not raised in Fields's opening brief, the misconduct-accusation claim is effectively waived. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005).

We now turn to Fields's argument that the district court failed to inquire into the conflict at issue. His argument fails for two reasons.

### (1) Under the Circumstances, the Court Adequately Inquired

First, the court adequately investigated the potential conflict. It held an *ex parte* hearing on Fields's motion for substitute counsel. At that hearing, the court listened to Fields's lead attorney speak about the conflict. The attorney described the nature of the prior prosecution, the approximate date on which it took place, and the extent of Peterson's involvement in it. The court also heard Fields's counsel's opinion that the "issue" was not really a conflict and had not affected the quality of Fields's representation. Afterward, the court gave Fields the opportunity to discuss the alleged conflict, which he declined to do.

Fields complains that the court did not affirmatively question the parties involved. Yet, the purpose of the duty to inquire is to assure that the court is apprised adequately of "the nature of a conflict" and its potential impact on counsel's capacity to represent the defendant. *See United States v. Humphrey*, 287 F.3d 422, 437 (6th Cir.), *overruled on other grounds by United States v. Leachman*, 309 F.3d 377 (6th Cir. 2002). Here, that purpose was satisfied because discussions the court heard on the record apprised it sufficiently of the relevant facts. *See Holleman v. Cotton*, 301 F.3d 737, 744 (7th Cir. 2002) (noting, while addressing

63

a duty-to-inquire issue, "the presumption that attorneys make truthful representations to the court"); *United States v. Hurn*, 952 F.2d 190, 195 (8th Cir. 1991) ("A district court may give substantial weight to defense counsel's representations regarding conflicts of interest."). Those facts showed that the conflict was insubstantial.

Where a conflict appears serious and the existing information available to the court is limited, "probing and specific questions" indeed may be required. *See* WAYNE R. LAFAVE ET AL., 3 CRIMINAL PROCEDURE § 11.9(b) (3d ed. 2000). But that is not the case here. The duty to inquire is not so formalistic as to require affirmative questioning when such is rendered unnecessary because the parties have volunteered all the relevant information for a court to determine that no substantial conflict exists. "[T]he trial court did not have a duty to inquire any further." *See Dunn*, 162 F.3d at 307.

### (2) Any Failure to Inquire Further Did Not Affect the Voluntariness of Fields's Waiver

Second, even if the court should have made a greater inquiry, Fields has made no showing, as distinguished from mere speculation, that the district court would have learned anything material from that inquiry. *See United States v. Fish*, 34 F.3d 488, 493 (7th Cir. 1994) (examining whether "the alleged failure of the court to delve deeper into the alleged conflict resulted in its lacking any material information to make the conflict determination"). A fail-

ure to inquire would not, in and of itself, be Sixth Amendment error warranting reversal.  *See Mickens v. Taylor*, 535 U.S. 162 (2002).  Moreover, without showing that the court failed to elicit information that would have revealed a substantial conflict, Fields cannot show that any failure to inquire affected the voluntariness of his waiver of counsel.  Fields's unsupported hypothesizing that he might not have waived counsel had the court explained to him "the kinds of conflicts tolerated by law" is not sufficient.

Finally, we note that Fields's (1) suspicions that his attorneys were in cahoots with the Government and (2) generic assertions of a conflict of interest did not impose upon the court a duty to inquire further.  The Supreme Court has stated that merely a "vague, unspecified possibility of conflict" does not trigger a duty to inquire.  *See Mickens*, 535 U.S. at 168–69.  Fields's nebulous statements raised nothing more than a vague, unspecified possibility of conflict.[37]

Indeed, Fields's previous requests for new counsel reflect that he misunderstood the term "conflict of interest."  He used the term to signify a "conflict" between his own view of appropriate

---

[37]  Fields also suggests that the district court failed to investigate the reasons for his dissatisfaction with his attorneys before denying his request for new counsel.  The record shows otherwise.  As stated above, the court invited Fields to explain his qualms with his present counsel.  Fields's explanation simply did not provide good cause for new counsel.

65

trial strategy and that of his counsel.[38]  Mere disagreement about strategic litigation decisions is not a conflict of interest.  *See, e.g.*, *United States v. Corona-Garcia*, 210 F.3d 973, 977 n.2 (9th Cir. 2000).  In context, then, Fields's unspecified assertions of a conflict appear even more benign.

In conclusion, Fields's claims surrounding Peterson's alleged conflict of interest fail.

### 3.  JURY INSTRUCTION ON SIGNIFICANCE OF THE INDICTMENT

Fields argues that the district court erred in instructing the jury venire about the significance of the grand jury's decision to indict him.  The court instructed the jury venire that the grand jury's finding of probable cause meant the grand jury believed "more likely than not" that Fields had committed the offense.  Fields points out that the probable cause standard is lower than the preponderance standard.  *See, e.g.*, *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001).  The Government argues, *inter alia*, that any error did not prejudice Fields.

Because Fields did not object to the instruction below, his claim is reviewed for plain error.  *See United States v. Saldana*, 427 F.3d 298, 304 (5th Cir.), *cert. denied*, 126 S. Ct. 810 (2005), *and cert. denied*, 126 S. Ct. 1097 (2006).  He bears the burden of

---

[38] For example, in late 2003 Fields wrote to the court: "Defense counsel informed me of their strategy and I disagreed therefore rose a conflict. . . .  There is a serious conflict of interest and if my Attorneys would have informed me of their strategy sooner, this motion would have reached you sooner."

showing that the error affected his substantial rights. *See, e.g.*, *Garza*, 429 F.3d at 169. Fields cannot carry this burden. The jury venire was repeatedly instructed that the grand jury's indictment could not be considered as evidence. Additionally, the court instructed that Fields maintained the presumption of innocence. It advised that the Government bore the burden of proving guilt beyond a reasonable doubt and gave a correct definition of that standard of proof. The petit jury never was instructed to apply the preponderance standard.

In sum, although the court incorrectly advised the jury venire about the grand jury's finding, it correctly instructed the petit jury about its own task and correctly required that it perform that task independently from the indictment. "Jurors are presumed to follow their instructions, and there is no reason to assume that they did not do so in this instance." *Woods v. Johnson*, 75 F.3d 1017, 1036 n.29 (5th Cir. 1996) (internal citation omitted). Thus, Fields cannot show that the error affected his substantial rights.

## 4. PHOTOGRAPHS OF MURDER VICTIM

Fields's fourth claim of trial error is that the district court erroneously admitted into evidence thirty-two photographs of the victim's body. Fields contends that the photos were extraordinarily prejudicial and had minimal, if any, probative value.

### a. Rule 403 and Standard of Review

The governing law and our limited standard of review bear

emphasis.  Federal Rule of Evidence 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  One purpose of Rule 403 is to prevent evidence from "inducing decision on a purely emotional basis."  FED. R. EVID. 403 (Advisory Committee Notes).  However, to warrant exclusion, the danger of unfair prejudiceSSon this ground or any otherSSmust *substantially* outweigh the probative value of the evidence.  Accordingly, we have recognized that Rule 403's scope is narrow.  "[T]he application of Rule 403 must be cautious and sparing.  Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  *United States v. Pace*, 10 F.3d 1106, 1116 (5th Cir. 1993).

In light of these principles, we will not lightly second-guess a district court's decision to admit relevant evidence over a Rule 403 objection.  Although reviewing courts use a great variety of verbal formulae to express this fact, all agree that we must afford an especially high level of deference to district courts in such circumstances.  Thus, a district court's decision on Rule 403 grounds is disturbed "rarely" and only when there has been "a clear abuse of discretion."  *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986); *see United States v. Caldwell*, 820 F.2d 1395, 1404 (5th Cir. 1987).

b.  The Photographs

We have independently examined the photos at issue.  They fall into two broad categories: nineteen photos taken at the crime scene and thirteen taken in connection with the autopsy.

Many of the crime scene photos show the victim's body from various angles and from various degrees of proximity.  In the photos, the body is in an advanced state of decomposition and has been subject to animal predation.  The skin is discolored and has sloughed off the bones.  The body is surrounded by thick brush and garbage.  Other crime scene photos illustrate how the responding officers processed the body.  Exhibit 34P, for example, shows that the hands were covered by paper bags.  Several others show that the corpse was placed in a body bag.

Of the thirteen autopsy photos, nine show the victim's skull.  Some of these photos show the gunshot wounds; others show the incision the medical examiner made to retrieve the bullets.  The four remaining photos show the body, removed from the crime scene, before the autopsy.  The most disturbing of these present the victim's decayed and misshapen corpse completely nude, the clothes apparently having been removed to facilitate the autopsy.

The crime scene and autopsy photos were presented through two witnesses, an officer who helped process the crime scene and the medical examiner who performed the autopsy.

c.  Analysis

Many of the photos are, as the defendant posits, shocking.  However, our caselaw indicates that admitting gruesome photographs

69

of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value. *See, e.g.*, *United States v. Hall*, 152 F.3d 381, 401 (5th Cir. 1998), *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304 (2000). As explained below, the photos here did have real probative value. This fact gave the court a reasonable basis for admitting them.

The photos showing the victim's body decomposing were highly probative. One of Fields's key themes at trial was that the Government had little physical evidence linking him to the crime. In his opening statement, for example, Fields argued that it was "not possible" to "commit a murder in the time and manner in which the government witnesses allege and not leave any physical evidence." Similarly, at closing, Fields argued, "I asked you all to pay attention to the physical evidence . . . . Whatever evidence that they retrieved from the body or the crime scene doesn't match me." Fields also highlighted the lack of DNA evidence: "Is there any positive DNA testing . . .? No. There isn't."

The crime scene photos were necessary to rebut Fields's arguments. They helped explain why little physical evidence was found: because it had been carried away by animals or worn away by

the elements.  In this age of the supposed "CSI effect,"[39] explaining to the jury why the Government had little in the way of physical or scientific evidence was arguably critical to the Government's case.

The photos had additional relevance.  The crime scene photos indicated that the body had been dragged to where it was found, thereby corroborating witnesses who testified that Fields told them he had dragged the body.  In addition, the wide shots, showing brush and trash surrounding the body, helped explain to the jury why the body was not found until weeks after the murder.  Finally, the autopsy photos helped the jury understand the medical examiner's testimony.  Since some photos showed two gunshot wounds, they supported the Government's (and medical examiner's) theory about cause of death.  This was necessary to corroborate the Government's confession evidence: Government witnesses testified that Fields told them he shot the victim.

Fields argues, however, that some of the points made by the photos were not in dispute.  In *Hall*, another case involving photographs of a victim's corpse, we noted: "The fact to which the

---

[39] "The 'CSI effect' is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show *CSI: Crime Scene Investigation* has on juror behavior. Some have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain." Tom R. Tyler, *Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction*, 115 YALE L.J. 1050, 1050 (Mar. 2006).  Professor Tyler's article explains that the existence of a "CSI effect" is plausible but has not been proven empirically.

evidence is directed need not be in dispute."  152 F.3d at 401.

> The reason that a criminal defendant cannot typically avoid the introduction of other evidence of a particular element of the offense by stipulation is that the government must be given the opportunity "to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight."

*Id.* (quoting *Old Chief v. United States*, 519 U.S. 172 (1997)). Here, the Government's point that the body had decomposed too much for any physical evidence to be found was made more effectively with images than it would have been with vague generalizations about the difficulty in processing weeks-old crime scenes.

Fields also contends that admitting thirty-two photos was unduly cumulative.  This argument has four flaws that, taken together, show that it must fail.  First, many of the photos had different relevance from other photos.  Only a few of the photos, for example, showed with clarity that the victim's fingers had been eaten away such that recovering trace evidence from under the fingernails would be impossible.  Additionally, only a few showed clearly the gunshot wounds in the victim's skull.  While not every photo had probative value strictly independent from any other evidence presented, some of the photos clearly supported points distinct from points made by others.

Second, Rule 403 does not ban *per se* all duplicative evidence. It is not required that each piece of evidence admitted have an entirely unique theory of relevancy.  Indeed, Rule 403 provides

72

that courts should only exclude relevant evidence if the need to avoid cumulative presentation "substantially" outweighs the probative value of the evidence.

Third, Fields's arguments run up against our deferential standard of review. His brief points out at length that this specific photo or that specific photo was used to make points that might also have been made with other evidence or with another specific photo. This is precisely the sort of strict scrutinizing that we cannot do when reviewing a trial court's Rule 403 balancing decision.

Lastly, the marginal prejudice that any duplicative photo may have added in this case is minimal. The greatest risk of unfair prejudice resulted from the gruesome scenes depicted in the photos. As we determined above, those scenes were fairly in evidence. It is difficult to see how additional photos showing the same thing significantly harmed Fields. Indeed, Fields himself speculates that showing an inflammatory scene repeatedly may actually *diminish* its emotional impact. Accordingly, the district court did not clearly abuse its discretion in admitting the thirty-two photos of the victim's body.

### 5. USE OF THE STUN BELT

Fields's next claim is that the district court abused its discretion by requiring him to wear a stun belt at trial. Since Fields failed to object to the stun belt below, our review is only

73

for plain error. Fields contends (1) that the trial court failed to find explicitly that the stun belt was necessary or to exercise its discretion independently from the recommendation of the Marshals Service and (2) that the decision to use a stun belt was substantively unjustified in light of his good behavior during previous court appearances and due to the heightened prejudice restraints may cause a *pro se* litigant. We hold that the district court committed no reversible error.

As to Fields's first argument, we have held that a court "may rely heavily on the U.S. Marshal's advice when deciding whether defendants should be shackled during trial." *United States v. Ellender*, 947 F.2d 748, 760 (5th Cir. 1990). Moreover, a district court's failure to assign reasons for physically restraining a defendant—though erroneous—is not "reversible error" where those reasons "are readily apparent to us from the record." *United States v. Hope*, 102 F.3d 114, 118 (5th Cir. 1996). Here, the Marshals Service testified that Fields (1) had a violent criminal history, (2) had been "aggressive, volatile, and lewd" while in custody, and (3) had a "history of escape and escape attempts." The district court's reasons for restraining Fields are readily apparent.

Turning to Fields's second argument, the district court did not abuse its discretion in deciding to restrain Fields with a stun belt. Physical restraint may be justified where there is "a danger

of escape or injury to the jury, counsel, or other trial partici-pants." *See, e.g.*, *United States v. Joseph*, 333 F.3d 587, 591 (5th Cir. 2003). Fields posed just such dangers. That Fields had not previously misbehaved in court does not eliminate the import of Fields's previous prison escape attempts and history of violence. A trial court need not wait until an obviously dangerous defendant actually injures trial participants or tries to escape from the courtroom before restraining him. In addition, the district court appropriately took steps to minimize any risk of prejudice. Fields was allowed to conceal the stun belt under street clothes. Moreover, the court took into account the special problems that physical restraints might pose under Fields's decision to proceed *pro se*. It provided that both sides would remain seated before the jury. These steps ensured that the jury would neither see the stun belt nor surmise that Fields was being treated differently from the prosecutors. For these reasons, the court did not abuse its discretion.

    6.  JUROR EXCLUSION

Fields claims that the district court erred by excluding Juror Barnett due to his opposition to the death penalty. We review such claims for abuse of discretion, affording "considerable deference" to the trial court. *See United States v. Bernard*, 299 F.3d 467, 474 (5th Cir. 2002).

The court did not abuse its discretion in striking Barnett.

75

A court may strike jurors for cause if their views on capital punishment would "prevent or substantially impair" the performance of their duties "in accordance with the instruction and oath." *United States v. Webster*, 162 F.3d 308, 340 (5th Cir. 1998). Barnett stated that he "could never, regardless of the facts and circumstances, return a verdict which resulted in the death penalty." Similarly he stated at *voir dire*, "I don't believe that I would return a verdict of the death sentence *in any case*" (emphasis added). Statements like those made by Barnett provide a more than adequate basis for exclusion. *See, e.g.*, *Bernard*, 299 F.3d at 474. Contrary to Fields's arguments, the court need not have explored Barnett's positions any further given that Barnett "resoundingly" indicated his refusal to ever apply the death penalty. *See United States v. Flores*, 63 F.3d 1342, 1354 (5th Cir. 1995).

### 7. PROSECUTORIAL MISCONDUCT

Fields's next claim of trial error is that the Government committed numerous acts of prosecutorial misconduct that, individually and collectively, denied Fields due process.

#### a. Standard of Review

We apply a "two-step analysis" to claims of prosecutorial misconduct. *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004). First, we assess whether "the prosecutor made an improper remark." *Id*. If so, then we ask whether the defendant

was prejudiced.  We have made clear that the prejudice step of the inquiry sets a high bar:

> Improper prosecutorial comments constitute reversible error only where the defendant's right to a fair trial is substantially affected.  A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.  The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.

*United States v. Holmes*, 406 F.3d 337, 356 (5th Cir.) (internal citations omitted), *cert. denied*, 126 S. Ct. 375 (2005).

We generally look to three factors in deciding whether any misconduct casts serious doubt on the verdict: "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *United States v. Mares*, 402 F.3d 511, 515 (5th Cir.), *cert. denied*, 126 S. Ct. 43 (2005).

Furthermore, in assessing prejudice, occurrences of prosecutorial misconduct ordinarily must be viewed individually.  *See United States v. Wicker*, 933 F.2d 284, 292 (5th Cir. 1991); *United States v. Iredia*, 866 F.3d 144, 118 (5th Cir. 1989).  "There may be instances where improper statements, which are not individually prejudicial enough to require reversal, could cumulate to affect the defendant's substantial rights.  However, such instances are rare in this circuit." *Wicker*, 933 F.2d at 292.  We examine the cumulative error doctrine in Section 9 *infra*.

77

b.  Analysis

i.  Eliciting Inadmissible Evidence

Fields argues, first, that the prosecutors committed misconduct by taking advantage of Fields's *pro se* status and repeatedly soliciting evidence of prior bad acts.  *See* FED. R. EVID. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.").

As an initial matter, we have some difficulty with the allegation that the Government took advantage of Fields.  While it is true that the prosecutor is an officer of the court, ours ultimately is an adversarial system.  As such, it is the defendant's attorney, not the prosecutor, who primarily is charged with protecting the defendant's rights.  That is why courts universally recognize that representing oneself in criminal proceedings is "foolish[]," *Mayberry v. Pennsylvania*, 400 U.S. 455, 463 (1971), which in turn is why defendants must be advised of the dangers of self-representation before they can validly waive counsel, *see* *Faretta v. California*, 422 U.S. 806, 835 (1975).

Where those dangers have been hazarded voluntarily, "[w]e reject the notion that the prosecutor . . . must abide by some special rules . . . ."  *See State v. Hoff*, 644 P.2d 763, 812 (Wash. App. 1982).  Having waived his right to counsel, Fields cannot now demand that the prosecutors should have effectively served as his

lawyers by ensuring that there was no valid objection to their own evidence. *See id.* Thus, without affording Fields's misconduct claim any special treatment because he represented himself, we turn to its merits.

The incident highlighted by Fields is the Government's redirect examination of Kevin Burton, who testified that Fields had bragged to him about killing the victim. The Government elicited that Fields was "known to shoot people" and had tried to rob Burton. On re-redirect, the Government continued with the theme— eliciting that Fields was a "dangerous person" known for "shooting and robbing" crack dealers. Ultimately, the Government drew an objection from Fields, which was sustained. The court subsequently gave a curative instruction.

Fields argues that the Government's actions in examining Burton amount not only to an evidentiary violation but to prosecutorial misconduct. Viewing the Government's redirect examinations in context, we disagree. On cross-examination of Burton, Fields appeared to suggest that Burton had recently fabricated Fields's supposed confession. He asked Burton why he failed to report Fields's admission until well after it occurred. The Government's proffer of Fields's attempted robbery of Burton was used to support Burton's response; according to Burton, he did not come forward earlier because he was afraid of Fields. Fields's prior violent conduct toward Burton established that this was a plausible ex-

79

planation.  Prior misconduct is only inadmissible under Rule 404(b) if used for character propensity purposes.  Thus, the Government's initial redirect was proper.

The court did sustain an evidentiary objection on re-redirect as the Government continued to elicit more misconduct evidence. However, the foregoing establishes that the Government had a reasonable basis for pursuing evidence that Fields had committed violent acts, and the court gave curative instructions after sustaining the objection.  Under the circumstances, any marginal improper questioning of Burton falls woefully below the severity of what would be required to reverse Fields's conviction.[40]

### ii.  Goading Fields with Objections

Fields also complains that the prosecutors schemed to provoke and upset him with frequent objections.  A defendant proceeding *pro se* is expected to follow ordinary procedural rules.  *See Faretta*, 422 U.S. at 834 n.46.  Here, the prosecutors' objections to Fields's failure to do so were proper and, in fact, usually were sustained.  Since the Government's objections were clearly valid, we see no need to complicate matters with inquiry into the prosecutors' motives for objecting.  In short, there was no improper

---

[40] Fields also gestures to other instances where the Government allegedly elicited inadmissible prior bad acts evidence.  His briefing on this issue is nothing more than "see also" citations and descriptive parentheticals.  Since each allegation of misconduct must be viewed individually and since context is critical, *see Insaulgarat*, 378 F.3d at 461, these matters are inadequately briefed.  Consequently, we will not consider them.  *See United States v. Williams*, 400 F.3d 277, 283 (5th Cir. 2005).

conduct.

### iii.  Improper Sidebar Remark

Next, Fields argues that the prosecutors made an improper sidebar remark in their redirect examination of Edward Outley, the man who provided Fields with a gun on the night of his escape.  In cross-examining Outley, Fields attempted to show that Outley had recently fabricated his testimony.  Among other things, Fields asked Outley whether he told the grand jury about the gun.  When Outley said yes, Fields showed him a single page of his grand jury testimony.  At prompting from Fields, Outley stated that the document contained no testimony about a gun.  The jury was thereby left with the misimpression that Outley, in fact, had omitted any mention of the gun before the grand jury.  However, Outley had told the grand jury about the gun—just not on the single page of testimony highlighted by Fields.  After the Government confirmed this, the prosecutors asked Outley whether he "just fell for [Fields's] con [and] forgot that [he] had told [the Grand Jury] all about it . . . ."  When Outley answered in the affirmative, the prosecutors remarked that "[a] lot of people have fallen for that con."

Fields argues that prosecutors may not engage in name-calling. However, "[t]he use of colorful pejoratives is not improper." *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998); *see United States v. Malatesta*, 583 F.2d 748, 759 (5th Cir. 1978)

81

("Unflattering characterizations of a defendant do not require a new trial when such descriptions are supported by the evidence."). In this case, it appears that Fields deliberately tried to mislead the jury. In context, referring to Fields's actions as a "con" was not out-of-bounds. *See United States v. Windom*, 510 F.2d 989, 994 (5th Cir. 1975) (no mistrial was warranted where prosecutor called the defendant a "con artist"); *United States v. Caballero*, 277 F.3d 1235, 1249-50 (10th Cir. 2002) (no prosecutorial misconduct where defense questioning invited prosecutors to elicit testimony characterizing him as a "con man"); *Shoff*, 151 F.3d at 893 (no prosecutorial misconduct where prosecutor labeled the defendant a "con man" in opening statements). Thus, the prosecutor did not make an improper remark.

### iv. Improper Closing Argument

Finally, Fields complains that the prosecutors made several improper remarks at closing argument. Since Fields did not object below to the remarks, we review for plain error. *See United States v. Gallardo-Trapero*, 185 F.3d 307, 321 (5th Cir. 1999).

Most significantly, the prosecutors called Fields a "psychopath." Assuming *arguendo* that this remark was clearly or obviously improper, it did not affect Fields's substantial rights. Undoubtedly, the "psychopath" remark had some risk of inflaming the jury. However, the district court instructed the jury that it must decide the case based on the evidence and that "statements . . . or argu-

82

ments made by the lawyers are not evidence" and are "not binding upon you." Additionally, though Fields argues the murder case against him was not airtight,[41] the Government produced strong evidence of Fields's guilt. For example, four witnesses testified that Fields admitted murdering the victim. Those confessions were corroborated by physical evidence showing cause of death and the killer's attempt to hide the body. In light of this evidence, Fields has not shown that the prosecutors' remark casts serious doubt on the verdict.

Fields's remaining claims of improper closing argument also fail because he cannot show prejudice. Fields complains that the prosecutors offered their personal opinion on the case when they stated they were "sure" Fields planned on having sex with the victim with or without her consent. Fields also contends that the prosecutors injected impermissible character evidence into the jury's deliberations when they argued that Fields's courtroom manner showed that Fields "can't stand to not be in control." Fields failed to object to these comments below.

We again assume for the sake of argument that these two remarks were improper. Neither statement is so grave, however, that it risked prejudicing substantially the jury's deliberations. In light of the court's instructions and the strength of the evidence

---

[41] Fields does not point to any "holes" in the prosecution's case on the other counts. Indeed, as to the escape count, Fields admitted his guilt before the jury.

against Fields, Fields has not shown that either remark casts doubt on the correctness of the jury's verdict.

### 8.   MANAGEMENT OF STANDBY COUNSEL

Fields complains that the district court's management of his standby counsel violated his due process rights.  He argues that the court failed to "safeguard the orderly process of trial."  *See United States v. Nivica*, 887 F.2d 1110, 1122 (1st Cir. 1989). According to Fields, the court's inconsistent directions about the role of standby counsel were fundamentally unfair and compromised the integrity of the verdict.  Significantly, Fields does *not* claim that standby counsel's participation at trial intruded upon his Sixth Amendment right to self-representation.

### a.   Standard of Review

In the circumstances of this case, our review of this claim is limited.  Trial courts must make difficult "judgment calls" when trying to reconcile the role of standby counsel with a defendant's desire to represent himself.  *See McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984).  Since trial courts clearly are in the best position to make those calls, the Supreme Court has instructed us to accord "deference" to their decisions.  *Id.*  We will review for abuse of discretion.  *See United States v. Lawrence*, 161 F.3d 250, 253 (4th Cir. 1998).  Here, Fields failed to object below to the court's standby-counsel orders.  Thus, our deferential review is restricted even further by the plain-error doctrine.  *See United*

*States v. Thompson*, 130 F.3d 676, 685 n.14 (5th Cir. 1997).

### b. Analysis

Fields's claim fails the first prong of plain error review: the district court did not abuse its discretion. The court's actions appear to us as nothing more than a reasonable attempt to deal with a trial that turned chaotic due to Fields's insistence on self-representation. *See United States v. Einfeldt*, 138 F.3d 373, 378 (8th Cir. 1998).

After Fields decided to represent himself, the court explained the role of standby counsel. They would serve as Fields's "legal reference material." However, Fields was responsible for making statements to the Court and framing questions to witnesses. Accordingly, Fields's standby counsel were instructed that they could not "represent him through him." The crux of Fields's complaint now appears to be that the court, while initially requiring that standby counsel play this very limited role, thereafter allowed them to participate more and more, rendering the rules for standby counsel incomprehensible and compromising the orderly process of trial.

It is necessary to put this complaint in perspective. Fields's attempt at self-representation was, as he acknowledges, "predictably catastrophic." Not surprisingly, Fields lacked the legal ability to abide by the elementary rules of courtroom procedure. Fields's questions frequently were argumentative, e.g.:

"Mr. Davis, being a government witness, it's your job to make excuses for the lack of evidence; am I correct?". Often they were improper, e.g.: "Ms. Hilliard, do you know why [the victim's] baby was born premature? . . . Isn't it true that [she] drunk liquor and vinegar in an attempt to abort--" and "Are you aware that the witness that was just up here said--". Many times Fields's questions were not questions at all. While cross-examining a fellow inmate who testified that Fields confessed to him, Fields said, "Man, I don't know you from the man in the moon." He told another witness,"You been watching too many Westerns."

The court sustained Government objection after Government objection. For example, during Fields's cross-examination of a witness named Shaylakea Scroggins, the court sustained hearsay objections to four consecutive questions, along with many others. Eventually, the progress of trial became so frustrated by improper questioning that the court dismissed the jurors to determine which of Fields's questions would be acceptable.

This context shows that Fields's complaint about the court's allegedly inconsistent management of standby counsel has no merit. The record indicates that the court had to permit an expanded role for standby counsel later in the trial precisely to ensure that the trial continued in an orderly fashion. *Cf. Dunn*, 162 F.3d at 307 (stating that an accused has a right to appear *pro se* only if "he is able and willing to abide by rules of procedure and courtroom

protocol"). Fields was allowed to confer frequently with standby counsel to develop his questions because he proved unable to formulate appropriate questions on his own. Standby counsel was allowed to make arguments for Fields outside the jury's hearing because Fields demonstrated that he could not protect his own interests. The disorderly situation caused by Fields's self-representation provided the court adequate justification for any inconsistency (if there was inconsistency) in its directives concerning standby counsel. There was no abuse of discretion and no violation of due process.

9.  CUMULATIVE ERROR

Fields's final guilt-phase claim is that his convictions must be set aside for cumulative error. Having determined above that none of his claims warrant reversal individually, we decline to employ the unusual remedy of reversing for cumulative error.[42] Many of Fields's claims do not amount to error at all. *See* Section II.B.2., 4., 5., 6., 7., & 8. *supra*. The remainder do not justify reversal under the cumulative error doctrine because they did not

---

[42] Fields also argues that the trial errors cumulatively infected his sentencing by creating an unacceptable risk that the jury imposed a death sentence "under the influence of passion, prejudice, or any other arbitrary factor." 18 U.S.C. § 3595(c)(2)(A). Having rejected nearly all of Fields's claims of trial error, we find that any errors that may have occurred do not cumulatively warrant reversing his sentence, especially in light of the district court's instruction that the jury must avoid the influence of "passion, prejudice or sympathy" and base its sentence upon the evidence. We also decline Fields's invitation to exercise our supervisory authority to reverse his sentence.

"so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004). Accordingly, Fields's convictions are affirmed.

### III.  CONCLUSION

For the reasons above, we AFFIRM Fields's convictions and sentence.

BENAVIDES, Circuit Judge, dissenting from Part II.A.1 and dissenting, in part, from the judgment.

The value of confrontation is never more vivid than when the state puts a defendant to death based on testimony he had no opportunity to challenge. This was appreciated more than two-thousand years ago, when the Roman Governor Festus declared, "It is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face." *Coy v. Iowa*, 487 U.S. 1012, 1015 (1988) (*quoting* Acts 25:16). Today, the majority announces that when it comes to putting defendants to death, "We are no Romans."

Sherman Lamont Fields was sentenced to death based on adverse testimony he never had an opportunity to confront. That is all I need to know to find that the Confrontation Clause has been offended. The majority places undue emphasis on the artificial distinction between eligibility and selection factors at capital sentencing, and completely neglects to consider recent developments in the Sixth Amendment as to confrontation and sentencing.

When a jury cannot practically hand down a death sentence without finding certain facts, testimony as to those facts must be tested through confrontation. I would find that confrontation rights extend to FDPA capital sentencing, that those rights were violated below, and that resentencing is required.

## I.   The Confrontation Clause Applies at Capital Sentencing

Confrontation Clause analysis today bears little resemblance to its former self.  It has changed significantly in the past few years.  *See Davis v. Washington*, 126 S. Ct. 2266, 2273-74 (2006); *Crawford*, 541 U.S. 36 (2004).  One of the few areas undergoing a similarly drastic transformation is criminal sentencing.  *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 961 (2004).  It should come as no surprise, then, that when courts are now asked to articulate how these two reconceptualized areas of law intersect—especially with regard to *capital* sentencing—disagreement abounds.

The persuasive authorities, and our Sister Circuits in particular, are divided on the issue *sub judice*.[43]  A recent panel of

---

[43] *Compare Proffitt v. Wainwright*, 685 F.2d 1227, 1254 (11th Cir. 1982) (holding that "the right to cross-examine adverse witnesses applies to capital sentencing hearings"); *United States v. Mills*, 446 F. Supp. 2d 1115, 1135 (C.D. Cal. 2006) ("*Crawford v. Washington's* protections apply to any proof of any aggravating factor during the penalty phase of a capital proceeding under the FDPA."); *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005) (reversing a death sentence under *Crawford* because the trial court admitted testimonial hearsay at the punishment phase), *cert. denied*, 126 S. Ct. 2982 (2006), *and cert. denied*, 126 S. Ct. 2982 (2006); *State v. Bell*, 603 S.E.2d 93, 115–16 (N.C. 2004) (applying *Crawford* to hold that the introduction of testimonial hearsay at the sentencing phase of a capital trial violated the Confrontation Clause); *and Rodriguez v. State*, 753 So. 2d 29, 43–44 (Fla. 2000) (holding that "the Sixth Amendment right of confrontation applies to all three phases of the capital trial" and that "the admission of . . . hearsay statements of co-defendants in the penalty phase violated the Confrontation Clause") *with Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (holding that the Confrontation Clause "applies through the finding of guilt, but not to sentencing, even when that sentence is the death penalty"); *State v. McGill*, 140 P.3d 930, 940–42 (Ariz. 2006) (*Crawford* does not apply to penalty phase of capital

(continued...)

this Court recently presumed that the Confrontation Clause applies at capital sentencing, but did so without explicitly holding so. *Coble v. Dretke*, 444 F.3d 345, 353-54 (5th Cir. 2006). After a thorough consideration of constitutional text, history, structure, and precedent, I would find that the Confrontation Clause applies with full force to capital sentencing under the Federal Death Penalty Act ("FDPA").

A. *Williams v. New York* Is Not Controlling

No Supreme Court opinion has directly addressed whether the Confrontation Clause applies to capital sentencing. Even if one had, it would surely have been called into question by the Supreme Court's recent Confrontation Clause and sentencing cases. It is therefore somewhat surprising that the majority relies so heavily on *Williams v. New York*, a due process case decided nearly sixty years ago that has been repeatedly limited by subsequent cases.

---

[43](...continued)
trial); *State v. Stephenson*, 195 S.W.3d 574, 590-91 (Tenn. 2006) (same); *United States v. Johnson*, 378 F. Supp. 2d 1051, 1062 (N.D. Iowa 2005) (holding that *Crawford* does not apply to sentence-selection phase of capital sentencing); *and People v. Simms*, 659 N.E.2d 922, 930 (Ill. 1995) (rejecting *Proffitt*).

In a footnote in *Proffitt*, the Eleventh Circuit stated, "Our decision that the right of cross-examination of adverse witnesses is extended to capital sentencing proceedings is necessarily limited to the facts of the case before us, involving psychiatric reports." 706 F.2d 311, 312 (11th Cir. 1983) (on petition for rehearing). However, both the Eleventh Circuit and this Court have since recognized that *Proffitt* stands for the general proposition that "the constitutional right to cross-examine witnesses applies to capital sentencing hearings." *United States v. Brown*, 441 F.3d 1330, 1361 n.12 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 1149 (2007); *see United States v. Hall*, 152 F.3d 381 (5th Cir. 1998).

*Williams* was a capital case that held the Due Process Clause did not "render[] a sentence void merely because a judge gets additional out-of-court information to assist him in [sentencing]." 337 U.S. 241, 252 (1949). In *United States v. Hall*, this Court addressed *Williams* in light of a Confrontation Clause challenge to FDPA sentencing. 152 F.3d 381, 405–06 (5th Cir. 1998). In *Hall*, we assumed without deciding "that the Confrontation Clause applies to the sentencing phase of a capital trial with the same force with which it applies during the guilt phase." *Id.* In so doing, we noted this as an undecided issue and expressed doubt that *Williams* resolved it:

> [I]t is significant that in *Williams* the Court addressed a due process challenge under the Fourteenth Amendment. The Court did not hold that the Sixth Amendment right to confrontation applied to the states via the Fourteenth Amendment's Due Process Clause until over fifteen years after *Williams* was decided. It is thus quite question-able whether *Williams* is controlling with respect to the determination of whether the Sixth Amendment right to confrontation extends to capital sentencing hearings.

*Id.* at n.13 (internal citations omitted); *see also* note 48, *infra*. *Williams's* authority on this basis is frequently doubted.[44]

---

[44] *See United States v. Silverman*, 976 F.2d 1502, 1525–26 (6th Cir. 1992) (Merritt, C.J., dissenting) ("In *Williams*, . . . the question was whether the Due Process Clause—not the Confrontation Clause—allowed the trial judge to use general hearsay information in the sentencing process."); *United States v. Wise*, 976 F.2d 393, 408 (8th Cir. 1992) (Arnold, C.J., concurring in part and dissenting in part) ("*Williams* . . . is not a Confrontation Clause case at all. It is a due-process case from a state court, decided before the Confrontation Clause was held applicable to the states."); *Proffitt v. Wainwright*, 685 F.2d 1227, 1253 (11th Cir. 1982) (stating that, notwithstanding *Williams*, whether
(continued...)

While there was severe doubt as to *Williams*'s vitality a decade ago, the Supreme Court's overhaul of the Confrontation Clause, *see Crawford*, 541 U.S. 36, and the "sea change in the body of sentencing law" since then have made *Williams* even less informative to the question we face today. *See United States v. Pineiro*, 377 F.3d 464, 468-69 (5th Cir. 2004), *vacated*, 543 U.S. 1101 (2005). While *Williams* may have some enduring value with regard to the introduction of nontestimonial hearsay at sentencing, *testimonial* hearsay requires separate treatment.[45]

---

[44](...continued)
"the right to cross-examine adverse witnesses extends to capital sentencing proceedings has not been specifically addressed by the Supreme Court."); *see also Maynard v. Dixon*, 943 F.2d 407, 414 n.5 (4th Cir. 1991) (discussing *Williams* but noting as unresolved the "fundamental question of whether the sixth amendment right of confrontation applies to all aspects of the sentencing phase [of a capital trial]"); *United States v. Kikumura*, 918 F.2d 1084, 1103 n.19 (3d Cir. 1990) ("We hope . . . that the Supreme Court in the near future will decide whether confrontation clause principles are applicable at sentencing hearings."); Alan C. Michaels, *Trial Rights at Sentencing*, 81 N. C. L. REV. 1771, 1837 (2003) ("[*Williams*] was decided on due process grounds alone, however, and was decided sixteen years before the Confrontation Clause was incorporated against the states."); Note, *An Argument for Confrontation Under the Federal Sentencing Guidelines*, 105 HARV. L. REV. 1880, 1890 (1992) (hereinafter "*An Argument for Confrontation*") (criticizing Courts of Appeals for failing to notice that "*Williams* was not a Confrontation Clause case").

[45] The majority reasons that because the Supreme Court has previously analyzed hearsay admissibility at sentencing under the Due Process Clause, that somehow means the Due Process Clause—not the Confrontation Clause—is ordained as the relevant framework for such challenges. This reads far too much into *Williams* and *United States v. Specht*, 386 U.S. 605 (1967). In neither case did the appellant so much as mention the Confrontation Clause in its briefs and, accordingly, the Court did not consider it. The Court's failure to address unraised arguments hardly provides grounds for an implied holding. This mistake might explain the majority's repeated disregard for the distinction

(continued...)

B.  *Crawford* and *Apprendi* Render *Williams* Inapplicable

*Williams* was based on two antiquated premises that have since been rejected by the Supreme Court:[46] (1) the Confrontation Clause is just a constitutional rule against hearsay, inextricable from the rules of evidence, and (2) the capital trial and sentencing are fundamentally different procedures that give rise to entirely different evidentiary concerns.

1.  The Confrontation Clause Distinguished from the Rules of Evidence

*Crawford* explicitly rejected the former premise, holding that the Confrontation Clause was not dependent on "the vagaries of the rules of evidence." 541 U.S. at 61. The Confrontation Clause and the rules of evidence offer entirely separate protections. Conforming to evidentiary rules regarding hearsay will not satisfy the Confrontation Clause. *Id.* at 61-62. Likewise, if a hearsay statement is not testimonial, the Confrontation Clause offers no protection. *Davis*, 126 S. Ct. at 2273.

With that understanding, *Williams* applies only to non-testimonial hearsay. That "the rules of evidence applicable to the manner in which a judge may obtain information to guide him in the

---

[45](...continued)
between nontestimonial and testimonial hearsay, inasmuch as that is a distinction only relevant to a Confrontation Clause inquiry.

[46] *See* Michael S. Pardo, *Confrontation Clause Implications of Constitutional Sentencing Options*, 18 FED. SENT. R. 230 (April, 2006) (describing these premises and their inapplicability given recent cases).

imposition of sentence," *Williams*, 337 U.S. at 244, are more relaxed than evidentiary rules at trial says nothing about the content of the Confrontation Clause. Even if the rules of evidence have *no* application at sentencing in light of the FDPA's "blanket exception to the hearsay rule," *United States v. Robinson*, 367 F.3d 278, 292 (5th Cir. 2004), that does nothing to preclude Confrontation Clause protections.

The majority falters by treating the rules of evidence in lockstep with the Confrontation Clause. It repeatedly fails to appreciate the distinction between testimonial and nontestimonial hearsay. For instance, at one point it states that "[i]ncluded in the notion that information influencing a sentencing decision need not be introduced in open court is the idea that defendants have no confrontation right at that phase of a trial." Of course, that is only true if the "information" happens to be *testimony*, but any other form of information introduced outside of open court—including nontestimonial hearsay—raises no Confrontation Clause issues whatsoever.[47] All of the majority's concerns about depriving the sentencing authority of a broad range of evidence are misplaced, since extending the Confrontation Clause to sentencing does not preclude the relaxation of the rules of evidence. It is limited to testimonial evidence, as that alone implicates the Confron-

---

[47] That is not to say that there are no concerns—since due process and statutory restrictions may still serve to exclude such evidence—just that they are not Confrontation Clause concerns.

95

tation Clause.

The majority's reliance on *Williams* is a sort of pre-*Crawford* relic surfacing a few years too late to be defensible. While *Williams* may still render the rules of evidence non-binding at sentencing, it has no bearing on the Confrontation Clause as recently extracted from those rules by *Crawford* and *Davis*.

### 2. The Convergence of Trial and Capital Sentencing

Second, the notion that capital sentencing proceedings are fundamentally different from trials no longer prevails. That conception has been eroded by both the longstanding *Furman v. Georgia*, 408 U.S. 238 (1972), line of cases, and the more recent *Apprendi v. New Jersey*, 530 U.S. 466 (2000), line. Ultimately, *Williams* provides little guidance because "[t]he bases of the *Williams* decision . . . have been eroded as applied to capital cases." *United States v. Taveras*, 424 F. Supp. 2d 446, 457 (E.D.N.Y. 2006).

*Williams* supposed that there was no "constitutional distinction" between capital sentencing and ordinary sentencing. 337 U.S. at 252. *Williams*'s critical backdrop was a sentencing scheme characterized by informal procedures and extraordinary discretion, one in which "no federal constitutional objection would have been possible" even if a judge gave "no reason at all" for a death sentence. *Id.* These premises no longer hold true. As explored further below, the death penalty invokes unique sentencing concerns. *See United States v. Brown*, 441 F.3d 1330, 1361 n.12 (11th

96

Cir. 2006) (explaining that the Confrontation Clause applies at capital sentencing because "death is different"), *cert. denied*, 127 S. Ct. 1149 (2007). The Constitution requires more stringent substantive and procedural protections before that penalty may be imposed. *See, e.g.*, *Furman*, 408 U.S. 238.

Moreover, the more recent *Apprendi/Ring/Blakely/Booker* line of cases casts doubt on the majority's repeated assumption that *Williams* plainly controls at ordinary sentencing. 530 U.S. 466 (2000); 536 U.S. 584 (2002); 542 U.S. 296 (2004); 543 U.S. 220 (2005). While that statement would have been less troubling a decade ago,[48] I for one cannot turn a blind eye to the complexities the *Crawford* and *Apprendi* cases have layered onto this issue.

I agree that the Confrontation Clause typically will not apply at noncapital sentencing, so long as the sentencing facts apply to an indeterminate scheme and a judge has broad discretion in imposing the sentence. Only to that extent is *Williams's* application plain. But the Supreme Court recently recognized that even noncapital sentencing is not always so different from trial pro-

---

[48] The majority offers many permutations of this view: "caselaw definitively maintains the *Williams* principle in the noncapital context," "the confrontation right [is] admittedly nonexistent at noncapital sentencing," "it has already been established that the right of confrontation is nonexistent."

While *Williams* has some application, its holding is limited to the rules of evidence as recently extracted from the Confrontation Clause, as explained above. It cannot be read for any broader holding than that.

97

ceedings, and if the sentencing facts "increase the prescribed range of penalties to which a criminal defendant is exposed" such that the sentencing fact is the "equivalent of an element of a greater offense than the one covered by the jury's guilty verdict," *Apprendi*, 530 U.S. at 490, 494, then the Confrontation Clause should apply and *Williams* does not control even in the noncapital context.

Insofar as the sentencing fact is the equivalent of an element of the offense, Confrontation Clause protections logically apply at sentencing. *See United States v. Mills*, 446 F. Supp. 2d 1115 (C.D. Cal. 2006); *United States v. Gray*, 362 F. Supp. 2d 714, 725 (S.D. W. Va. 2005); *see also* Michael S. Pardo, *Confrontation Clause Implications of Constitutional Sentencing Options*, 18 FED. SENT. R. 230 (April, 2006). Even the Seventh Circuit, the only circuit to agree with the majority's holding here, recognizes that "the Confrontation Clause applies during those portions of a sentencing proceeding that can lead to an increase in the maximum lawful punishment." *See Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (citing *United States v. Specht*, 386 U.S. 605 (1967)).

The majority is quick to point out that the contested testimony in this case applied only to selection factors, as op-posed to eligibility factors. It finds that "[t]he establishment of nonstatutory aggravating factors is neither necessary nor suf-ficient to authorize imposition of the death penalty." But that

98

artificial categorical approach to sentencing ignores the stark reality of this case; because the jury unanimously found seven mitigating factors in Fields's favor—and a number of other mitigating factors were found without unanimity—it is without doubt that the death penalty would not have been imposed but for the establishment of aggravating factors at the selection phase. To state that those factors were not necessary to impose the death penalty requires the majority to turn a blind eye to the practical realities of capital sentencing.

While the majority attempts to describe the selection phase of FDPA sentencing as purely discretionary, a jury that finds a defendant death eligible "has not found all the facts which the law makes essential to the punishment." *Blakely v. Washington*, 542 U.S. 296, 303-04 (2004). The selection phase of the FDPA gives jurors significant discretion, but that discretion is curbed by requiring that the jury first ascertain the presence of mitigating factors. Assuming that mitigating factors exist, as several did here, the jurors must also find beyond a reasonable doubt that aggravating factors exist sufficient to outweigh the mitigating factors. While the actual weighing of the factors is not a "finding of fact," the existence of such factors is a "constitutionally significant factfinding" to which the Confrontation Clause

must attach.[49]

This is especially evident when, as here, the jurors found many mitigating factors that, on any plausible account, were only outweighed by aggravating factors that existed beyond those re-

---

[49] Perhaps my disagreement with the majority is based in how to classify the selection phase of FDPA sentencing. The Supreme Court has made clear that the aggravating factors required at the eligibility phase of FDPA sentencing are the equivalent of elements of the offense, and the Confrontation Clause would presumably attach at that phase since it is akin to a trial on the elements of the offense. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002). This case concerns the selection phase of FDPA sentencing, where the jury must find any additional aggravating factors beyond a reasonable doubt, find mitigating factors by a preponderance of the evidence, and then *must* determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." 18 U.S.C. § 3593(e).

I think the majority offers a distorted description of the selection process as merely providing the jury the "ability to select a lesser punishment in a capital case in spite of death-eligibility," as if it were nothing more than a mercy hearing. It is not nearly so discretionary, as it contemplates particularized additional findings from the jury regarding the existence of aggravating and mitigating factors. *See* John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 COLUM. L. REV. 1967, 1974–75 (2005) ("A defendant's right to cross-examine a crucial witness should not turn upon a legislature's designation of eligibility factors and selection factors, an often artificial distinction that bears little relationship to the real issues affecting the choice between life and death.").

But selection phase findings cannot be easily labeled as elements of the offense either, as the eligibility factors were found to be in *Ring*. Instead, we are faced with a hybrid finding that one court recently aptly labeled as "constitutionally significant factfinding." *Mills*, 446 F. Supp. 2d 1115, 1134. I agree with that court's finding that such constitutionally significant factfinding is more similar to eligibility findings than purely discretionary ones and thereby requires Confrontation Clause protections. *Id*. at 1134–35.

The FDPA's complicated and rigorous factfinding requirements also distinguishes it from typical noncapital sentencing, answering the majority's queries as to how my approach can be reconciled with the general rule that confrontation does not apply at sentencing. The FDPA simply requires more than the typical sentencing finding.

100

quired for an eligibility finding.  In short, when a jury cannot practically hand down a death sentence without finding certain facts, testimony regarding those facts must be tested through confrontation.[50]  If the government thinks it necessary to prove nonstatutory aggravating factors, then it should be required to do so with the Confrontation Clause in tact.

C.  The Sixth Amendment's Text

Because *Williams* is inapplicable and no Supreme Court opinion is directly controlling, I turn to the Constitution's text.  The Confrontation Clause applies in "all criminal prosecutions."  U.S. CONST. amend. VI.  "If 'plain meaning' is the criterion, this is an easy case.  Surely no one would contend that sentencing is not a part, and a vital one, of a 'criminal prosecution.'"  *Wise*, 976 F.2d at 407 (Arnold, C.J., concurring in part and dissenting in part); *cf. Robertson v. United States*, 417 F.3d 440, 447 (5th Cir. 1969) (en banc) (holding that the Confrontation Clause did not

---

[50] I use the word "practically" because it is admittedly conceivable here—albeit highly improbable given the seven mitigating factors the jury unanimously found—that the jury would have imposed the death penalty without finding any aggravating factors beyond those establishing death eligibility.  That chance cannot demean the practical significance of the additional aggravating factors that were raised against Fields without the protections of the Confrontation Clause. To place significant reliance on that possibility would be to exalt form over effect, as repeatedly warned against in the Court's recent sentencing cases. If the prosecution believes the aggravating factors establishing death eligibility are alone sufficient to outweigh the mitigating factors, it is at liberty to proceed without proving the "unnecessary" additional aggravating factors and avoid the issues addressed here.

apply to proceedings before a draft board because such proceedings "are not stages in a criminal prosecution").

This reading of the Sixth Amendment's text accords with the Supreme Court's Right to Counsel jurisprudence. The Supreme Court has held that sentencing is a critical stage of a criminal proceeding during which the Sixth Amendment's right to counsel applies. *See Mempa v. Rhay*, 389 U.S. 128 (1967). The Sixth Amendment extends the rights both to counsel and to confrontation in "all criminal prosecutions," suggesting that where one right applies, the other does too.[51] *See United States v. Petty*, 982 F.2d 1365, 1370–71 (9th Cir. 1993) (Noonan, J., dissenting); *cf.* JOHN H. LANGBEIN, THE ORIGINS OF ADVERSARY CRIMINAL TRIAL 291 (2003) (hereinafter "LANGBEIN, ORIGINS") ("Cross-examining prosecution witnesses was the primary task for which the judges admitted defense counsel to the felony trial.") The Sixth Amendment's text, read in light of *Mempa v. Rhay*, suggests that the Confrontation Clause should apply. Finding the Confrontation Clause inapplicable at sentencing forces the same phrase, "criminal prosecutions," to mean two different things depending on which clause it modifies. We should at least

---

[51] In full, the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense."

be wary of giving the text such a counterintuitive reading.

That jury sentencing is not required in capital cases does not undercut this reading. *See Spaziano v. Florida*, 468 U.S. 447 (1984). The Jury Clause has a unique second limitation that does not apply to the Right to Counsel or the Confrontation Clause: only a jury "trial" is required. *See* U.S. CONST. amend. VI. A jury is only required at trial, whereas both the Right to Counsel and the Confrontation Clause "apply more broadly to the whole 'criminal prosecution,' and thus to sentencing." John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 COLUM. L. REV. 1967, 2009 (2005) (hereinafter "*Confronting Death*"); *see An Argument for Confrontation*, *supra* note 44, at n.70.

Standing alone, the majority points out that this textual argument may prove too much, for it would apply equally at noncapital sentencing. "It is well established in this circuit that a criminal defendant's Sixth Amendment right of confrontation is sharply circumscribed in non-capital sentencing proceedings."[52] *Hall*, 152 F.3d 405. It is not the textual reading alone, however, which supports holding that the Confrontation Clause must apply to capital sentencing under the FDPA. As already mentioned, *Crawford* and *Apprendi* might lead to treating capital and noncapital cases

---

[52] Notably, we did not rely on *Williams* in holding that a defendant's rights under the Confrontation Clause are "severely restricted" in noncapital, Guideline sentencing proceedings. *See United States v. Rodriguez*, 897 F.2d 1324, 1328 (5th Cir. 1990).

differently, notes 49–50, *supra*, but four other considerations confirm that capital sentencing is unique when it comes to the Confrontation Clause: constitutional history, the trial-like nature of FDPA sentencing, the Supreme Court's death-is-different jurisprudence, and precedent specifically invoking a right of confrontation in post-*Furman* capital sentencing cases.

## D. History of Confrontation at Capital Sentencing

Setting aside for the moment the modern Supreme Court's insistence that death is different, history distinguishes capital sentencing from ordinary sentencing when it comes to confrontation rights. *See Confronting Death*, *supra*, at 1974. At the time the Confrontation Clause was written, a capital trial was a single, unified proceeding at which both guilt and sentence were decided. The Framers knew nothing of capital sentencing proceedings separate from trial. *See Wise*, 976 F.2d 393, 407 (Arnold, C.J., concurring in part and dissenting in part). As Blackstone wrote, once a defendant was convicted of a capital crime, "the court must pronounce that judgment which the law has annexed to the crime . . . ." 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND *376. For capital felonies, the common law made death the exclusive and mandatory sentence. *See Woodson v. North Carolina*, 428 U.S. 280, 289 (1976).

Nonetheless, a form of capital sentencing existed at the Founding. Proceedings that purported to be trials often functioned

104

as *de facto* sentencing hearings:

> The jury's power to mitigate sanctions profoundly affected the purpose of the criminal trial for those many offenses in which the jury might return a partial verdict. Only a small fraction of eighteenth-century criminal trials were genuinely contested inquiries into guilt or innocence. In many cases, perhaps most, the accused had been caught in the act or with the stolen goods or otherwise had no credible defense. To the extent that trial had a function in such cases beyond formalizing the inevitable conclusion of guilt, it was to decide the sanction.

LANGBEIN, ORIGINS, *supra*, at 59. To avoid meting out death for theft, juries would "bring in larceny to be under the value of a twelve-pence, when it [was] really of much greater value." 4 W. BLACKSTONE, *supra*, \*239. Additionally, the "murkiness" of the common law's distinction between manslaughter and murder empowered the trial jury with *de facto* sentencing discretion in homicide cases. *See* Welsh S. White, *Fact-Finding and the Death Penalty: the Scope of a Capital Defendant's Right to Jury Trial*, 65 NOTRE DAME L. REV. 1, 7–11 (1989); Thomas A. Green, *The Jury and the English Law of Homicide*, *1200-1600*, 74 MICH. L. REV. 413, 424–25 (1976). The Supreme Court has recognized the Colonial jury's practice of preventing death sentences by rendering factually dubious verdicts. *See Woodson*, 428 U.S. at 289–91.

The critical point is this: because these *de facto* capital sentencing proceedings took the form of full criminal trials, the defendant possessed full trial rights of confrontation. However,

the notion that capital sentencing might be conducted "outside of an adversarial trial" is strictly a "post-constitutional" phenomenon.  *Confronting Death*, *supra*, at 2016.

The majority reads this history selectively, treating the "sentencing authority's [newfound] ability to select a lesser punishment in a capital case in spite of death-eligibility" as just an added layer of protection for the defendant.  The majority paints the selection phase of capital sentencing as little more than a mercy hearing, where a defendant condemned to the gallows should be grateful just to have a chance to plead his case, no matter how limited the forum.

This picture does not accurately depict the FDPA's sentencing procedures.  The selection phase requires very specific factual and evaluative findings before the death penalty can be imposed.  *See* note 49, *supra*.  Defendants maintained confrontation rights when the critically important question of "life or death"[53] was posed to juries historically, and today we take that right away from them.

Another important point is that noncapital sentencing has a different history.  Early English and American cases suggest that judges conducted noncapital sentencing in informal proceedings featuring testimonial hearsay.  *Id.* at 2016 & nn.282–83.  In *Rex v. Sharpness*, for example, the court allowed the prosecutor to read an

---

[53] "Life or death?" has a distinctly different tone and importance than, "death eligible, or not death eligible?"

106

aggravating affidavit before sentencing the defendant to one month of imprisonment on the crime of "suffering a prisoner to escape." 99 ENG. REP. 1066, 1066 (K.B. 1786). Similarly, *State v. Smith* held that the defendant could present a sentencing court with mitigating affidavits to show that he deserved a reduced sentence for assault and battery. 2 S.C.L. (2 Bay) 62,62 (1796).

History supports constraining confrontation rights in noncapital sentencing, but capital sentencing has a different history that suggests the Confrontation Clause should apply.

## E.  "Trial-like" Proceedings and Sixth Amendment Structure

The Confrontation Clause should apply fully because FDPA sentencing, unlike noncapital sentencing, involves a trial-like adversarial proceeding. The Supreme Court applies certain "trial rights" to adversarial sentencing hearings that bear the "hallmarks of the trial on guilt or innocence." *Bullington v. Missouri*, 451 U.S. 430, 438–39 & n.10 (1981) (relying on trial-like format of Missouri's capital sentencing hearing—which provided for opening statements, formal testimony, jury instructions, proof beyond a reasonable doubt of aggravating factors, final arguments, and a formal jury verdict—in holding that the Double Jeopardy Clause applied to the proceeding); *see Morgan v. Illinois*, 504 U.S. 719 (1992).

*Strickland v. Washington*, for example, refused to distinguish Florida's capital sentencing from trial where effective assistance

107

of counsel was concerned.  The Court reasoned that Florida's death penalty statute created a sentencing proceeding "like a trial in its adversarial format and in the existence of standards for decision."  *Strickland*, 466 U.S. 668, 686–87 (1984).  Thus, the Court held that the Right to Counsel must apply fully to "ensure that the adversarial testing process works to produce a just result under the standards governing decision."  *Id.* at 687.

This jurisprudence reflects structural reasoning and suggests that adversarial rights are "interdependent."[54]  *See Confronting Death*, *supra*, at 1975.  The adversarial system is indeed a system, and its elements may not function effectively alone.

The FDPA, like many death penalty statutes, supplies adversarial sentencing hearings that resemble trials.  *See Thompson v. Oklahoma*, 487 U.S. 815, 856 (O'Connor, J., concurring in the judgment) ("As a practical matter we have virtually required that the death penalty be imposed only when a guilty verdict has been followed by separate trial-like sentencing proceedings, and we have extended many of the procedural restrictions applicable during criminal trials into these proceedings.")  The FDPA provides for

---

[54] This does not imply that Confrontation Clause error is "structural error" in the technical sense of that phrase. "Confrontation Clause errors, like other trial errors, are subject to harmless-error analysis." *Hall*, 152 F.3d at 406.

jury sentencing.[55]  18 U.S.C. § 3593(b).  In addition, hearings under the FDPA bear other hallmarks of a criminal trial.  Both sides are represented by counsel and present evidence; the Court instructs the jury; the Government, and then defense counsel, presents closing argument; the Government must prove aggravating factors beyond a reasonable doubt; the jury returns a formal verdict, and its verdict must be unanimous.  *See id.*

Requiring confrontation in the FDPA's trial-like sentencing regime is particularly appropriate given the interdependence of adversarial rights.  *See* Edmund M. Morgan, *The Jury and the Exclusionary Rules of Evidence*, 4 U. Chi. L. Rev. 247, 255 (1936) (arguing

---

[55] *See Robinson v. Polk*, 438 F.3d 350, 359 (4th Cir.) (holding that the Confrontation Clause "appl[ies] equally to sentencing proceedings tried to a jury"), *cert. denied*, 127 S. Ct. 514 (2006); *Chaffin v. Stynchombe*, 412 U.S. 17, 28 n.15 (1973) (explaining that "the institution of jury sentencing is unlike judicial sentencing in a number of fundamental ways"); Mark Silverstein, *Confrontation at Capital Sentencing Hearings: Illinois Violates the Federal Constitution by Permitting Juries to Sentence Defendants to Death on the Basis of Ordinarily Inadmissible Hearsay*, 22 Loy. U. Chi. L. J. 65, 74, 122 (1990) (hereinafter "*Confrontation at Capital Sentencing Hearings*") (arguing that *Williams* "discussed only judicial sentencing" and that the Supreme Court "has never indicated that it would extend *Williams* . . . to a sentencing jury"); *cf. United States v. Cardenas*, 9 F.3d 1139, 1154–56 (5th Cir. 1993) (en banc) (recognizing that the Confrontation Clause may provide greater rights in cases tried before juries than in bench trials).

A distinction between judge and jury when it comes to confrontation in capital sentencing may be justified by "the law's traditional view that a jury cannot be trusted to make a final determination affecting substantial rights on the basis of the uncross-examined statements of out-of-court declarants." *Confrontation at Capital Sentencing Hearings*, *supra*, at 124–25.  This skepticism did not extend to judges, who could discount the probative value of hearsay evidence and traditionally admitted it only "for what it's worth."  See Kenneth Culp Davis, *Hearsay in Nonjury Cases*, 83 Harv. L. Rev. 1362, 1264–65 (1970).

that the right to "cross-examine is an essential element" of any adversarial system).  If capital sentencing purports to provide a full-fledged adversarial proceeding, then a true adversarial proceeding it must give.  *See* Christopher K. Tahbaz, Note, *Fairness to the End: The Right to Confront Adverse Witnesses in Capital Sentencing Proceedings*, 89 COLUM. L. REV. 1345, 1368 (1989) ("Because the right of confrontation is fundamental to the adversarial process, it should be extended to capital sentencing procedures"); *cf. Morgan*, 504 U.S. at 727 (holding that "if a jury is to be provided the defendant [at capital sentencing], regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment").

In particular, a meaningful Right to Counsel at capital sentencing depends on confrontation rights.  The Confrontation Clause should apply to protect the Right to Counsel in death penalty proceedings.  *See Herring v. New York,* 422 U.S. 853, 857 (1975) ("[T]he right to assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process that has been constitutionalized in the Sixth and Fourteenth Amendments.").

Professor Douglass explains:

Sixth Amendment rights support each other. Without counsel, the right of cross-examination may be an exercise in futility.  Without the right to cross-examine the state's

110

witnesses or to present favorable evidence, the right to counsel may be an empty formalism.

*Confronting Death*, *supra*, at 2010. Douglass wonders what use the Right to Counsel would be at capital sentencing if Government witnesses were permitted "to answer the prosecutor's questions and then walk away before the defense counsel had an opportunity to probe." *Id.* at 1982; *see also Petty*, 982 F.2d at 1371 (Noonan, J., dissenting) ("What is the point of having counsel if counsel cannot exercise an essential function of counsel—the cross-examination of the witnesses against counsel's client?").[56]

The Confrontation Clause should apply at capital sentencing to ensure (1) that the "trial-like" "adversarial testing process" provided under the FDPA "works to produce a just result" and (2) that the Right to Counsel, in particular, functions effectively in capital cases. *See Strickland*, 466 U.S. at 687.

F.  Death is Different

The Eleventh Circuit applied the Confrontation Clause on the ground that the death penalty demands special procedures to assure reliability. *See Proffitt*, 685 F.2d at 1253–54. There is extensive and persuasive support for this position.

---

[56] While courts routinely avoid this obvious unfairness by allowing cross-examination of witnesses that do appear, the unfairness of using testimonial hearsay to establish deathworthiness, while perhaps less apparent, is no less real. With life or death on the line, the Government can now avoid defense cross-examination with the expedient of using out-of-court testimony.

The stringent, "trial-like" procedures that govern capital sentencing derive from the Supreme Court's unique concern with reliability in death penalty cases. "In capital proceedings generally, th[e] Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (internal citations omitted).

Confrontation is essential to reliability. Courts have repeatedly recognized cross-examination as "the greatest legal engine ever invented for the discovery of truth." *E.g.*, *White v. Illinois*, 502 U.S. 346, 356 (1992). "'Cross-examination is the principal means by which the believability of a witness and the truth of this testimony are tested.'" *Wilkerson v. Cain*, 233 F.3d 886, 890 (5th Cir. 2000) (quoting *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). The Supreme Court in *Crawford* maintained that "the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence." 541 U.S. at 61. The Confrontation Clause should apply to capital sentencing because those proceedings must aspire to greater reliability than ordinary sentencing.

The majority resists this logic. Citing *Gregg v. Georgia*,[57]

---

[57] 428 U.S. 153, 203–04 (1976) (plurality opinion).

it contends that allowing testimonial hearsay is necessary because the capital "sentencing authority must consult a broader range of considerations in deciding just punishment than a trial jury in deciding guilt."  Thus, a sentencing jury may properly consider victim impact evidence, *see Payne v. Tennessee*, 501 U.S. 808 (1992), and a sentencing judge in a capital case can take into account "the elements of racial hatred" involved in a murder. *Barclay v. Florida*, 463 U.S. 939, 949 (1983).  But the majority's argument is twice flawed.

First, applying the Confrontation Clause is consistent with this line of cases because it does not restrict the type of facts that may be proven at capital sentencing.  Rather, it only affects the *way* that they may be proven.  "Where a hearsay declarant is available to testify, *Crawford* merely requires the government to present that information in a different, albeit less convenient, form:  through the live testimony of the witness with direct knowledge of the facts."  *Confronting Death*, *supra*, at 2027; *see Porter v. State*, 578 S.W.2d 742, 748 (Tex. Crim. App. 1979) ("While the facts contained in the documents in question may have been relevant to the punishment, the manner in which the State sought to prove those facts denied appellant his constitutional rights of confrontation and cross-examination.").

Second, it is far from clear that applying the Confrontation Clause would result in "less evidence."  In some cases, excluding

113

testimonial hearsay may result in the loss of relevant information. When witnesses are available to testify, however, the jury will have the benefit of additional information developed on cross-examination. Therefore, applying the Confrontation Clause at capital sentencing is consistent with *Gregg* and reflects the Court's emphasis on increased reliability.

The majority's rule does not necessarily allow more information to come into capital sentencing, it merely admits one-sided evidence without any meaningful challenge.

G.   Cases Suggesting Confrontation Clause Rights

A number of cases that specifically invoke a right of confrontation in capital sentencing bolster this position. Although none definitively establish a full right of confrontation, these post-*Furman* cases provide far better guidance than *Williams v. New York*.

In *Gardner v. Florida*, the Supreme Court reversed a death sentence which was based in part on secret information not disclosed to the defense. 430 U.S. 349 (1977). The *Gardner* plurality cast doubt on the authority of *Williams*. It emphasized how capital sentencing had changed in the intervening years and stated that the "passage of time justifies a re-examination of capital-sentencing procedures." *Id.* at 356–57. Accordingly, *Gardner* limited *Williams*, stressing that the case had addressed a "'narrow

114

contention . . . relat[ing] to the rules of evidence applicable'"

to sentencing. *Id.* at 355 (brackets in original).[58] *Gardner* then

distinguished *Williams* on several grounds, noting as significant

that the trial judge in *Williams* was not asked to "'afford ap-

pellant a chance to refute or discredit any of [the statements at

issue] *by cross-examination* or otherwise.'" *Id.* at 356 (quoting

*Williams*, 337 U.S. at 244) (emphasis added). Reasoning that

"debate between adversaries is often essential to the truth-seeking

function," the Court then held that due process mandated that the

defense be able to "deny or explain" evidence used in capital

sentencing. *Id.* at 360–62.

Two years later, in *Estelle v. Smith*, this Court considered

the scope of *Gardner*. 602 F.2d 694 (5th Cir. 1979), *aff'd by Smith

v. Estelle*, 451 U.S. 454 (1981). In *Smith*, the prosecution omitted

from its witness list the name of a psychiatrist whose testimony on

the issue of future dangerousness was crucial to its case at the

penalty phase. This Court held that allowing a surprise witness

---

[58] The majority relies on *Gardner*'s posture as a due process case—as it relied on the posture of *Williams* and *Specht*—to insinuate that due process is the appropriate avenue for raising these challenges. But just because the Court found that Due Process Clause protections were violated does not foreclose the possibility that other rights were violated as well. Moreover, since the Court recognized that *Williams's* holding directly foreclosed the application of the rules of evidence at sentencing, 430 U.S. at 355, it is hardly surprising that the Court would not apply the Confrontation Clause at a time when it was swallowed up by evidentiary rules. Had the Confrontation Clause been given force independent of those rules—as it has today—one might expect that *Gardner* could have been a Sixth Amendment case.

violated the principles of *Gardner* in part because it undermined the defendant's "right to effective cross-examination." *Id.* at 698 n.3. The *Smith* Court's notation of a right to effectively cross examine was not an isolated slip of the pen. *Smith* refers to the need for effective cross-examination in capital sentencing four separate times. Connecting its holding to the Supreme Court's death-is-different jurisprudence, *Smith* opined that testimony not effectively cross-examined "carries no assurance of reliability whatever." *Id.* at 701. The Eleventh Circuit relied in part on our *Smith* decision to hold that the Confrontation Clause applies to capital sentencing. *See Proffitt*, 685 F.3d at 1254–55 ("The reasoning in *Smith* clearly supports the view that the right to cross-examine adverse witnesses applies to capital sentencing proceedings, at least where necessary to ensure the reliability of the witnesses' testimony.").

Contrary to the panel opinion, the ability to cross-examine a witness who presents hearsay testimony does not satisfy *Smith*'s requirements. That is a very thin view of what constitutes a "right to *effective* cross-examination." 602 F.2d at 698 n.3. Cross-examination would serve very little purpose if a defendant is allowed to cross-examine, not the accuser, but a person who reads the accuser's statement. The state could effectively insulate all of its adverse testimony by having witnesses write their statements out and then putting an officer on the stand to read them. While

116

that officer may then be questioned, his answers may logistically be confined to confirming or denying what a piece of paper says, leaving the substantive accusation and its source's credibility and motive completely untested. That is essentially what the state did in this case with Detective January.

Finally, the Supreme Court's reasoning in *Barefoot v. Estelle* presupposes the existence of confrontation rights at capital sentencing. *See* 463 U.S. 880, 902–03 (1983). *Barefoot* held that the Due Process Clause did not require psychiatric future-dangerousness testimony to be excluded from capital sentencing. Acknowledging the problems with such testimony, the Court stated that the defendant would have "the benefit of cross examination" to expose its flaws. *Id.* at 898–99.

Text, history, structure and precedent favor applying the Confrontation Clause with full force to capital sentencing. While *Williams* may still guide application of the rules of evidence at capital sentencing, the Confrontation Clause has been given new force, and it is unfortunate that the majority takes that force away at a time when it is most needed. It is clear to me, and I would hold that when a jury cannot plausibly hand down a death sentence without finding certain facts, those facts can only be found with the Confrontation Clause's protections.

## II.  Testimonial Statements Wrongfully Admitted

Having found that the Confrontation Clause has some appli-
cation to capital sentencing, I would turn to the challenged state-
ments to determine whether their admission violated Fields's
confrontation rights.  In *Crawford*, the Supreme Court held that the
Confrontation Clause bars "admission of testimonial statements of
a witness who did not appear at trial unless he was unavailable to
testify, and the defendant had had a prior opportunity for cross-
examination."  541 U.S. 36, 53–54 (2004).  *Crawford* did not draw
finely the line between testimonial and nontestimonial statements.
It did note, however, that "[s]tatements taken by police officers
in the course of interrogations" would qualify "under any defini-
tion" of testimonial.  *Id*. at 52.

Recently, the Court began marking the bounds of this *Crawford*
subcategory: Statements made in the course of police interrogation
"are testimonial when the circumstances objectively indicate that
there is no . . . ongoing emergency, and that the primary purpose
of the interrogation is to establish or prove past events poten-
tially relevant to later criminal prosecution."  *Davis*, 126 S. Ct.
at 2273–74.[59]  This rule suffices to resolve two of Fields's
*Crawford* challenges.

---

[59] The Court in *Davis* made clear that it was not marking the outer
bounds of testimonial statements or even of the subcategory of
statements made in response to police interrogation. *See* 126 S. Ct. at
2274 n.1.

## A.  Hearsay Witnesses to the King Shooting

Fields argues that he was denied confrontation rights when, over his objection, police officers were permitted to relate out-of-court statements to establish that Fields committed prior violent crimes.  These challenges are reviewed *de novo*.  *See United States v. Rueda-Rivera*, 396 F.3d 678, 680 (5th Cir. 2005).

### 1.  Detective January's Testimony

At Fields's sentencing hearing, the Government called Steve January, a Waco Police Department detective.  January testified about a shooting he investigated in 2000.  When the prosecution asked whether January "talked to witnesses" after responding to the incident, Fields objected under the Confrontation Clause.  After the district court overruled the objection, January testified based on "a cumulation of stories from different persons" and the statements of "at least five people" who the responding officers actually interviewed.  According to January, these stories and statements implicated Fields in the shooting of a man named Ladon King.  January testified that some of the witnesses he had interviewed saw the defendant shoot at King.

Based on January's investigation at the crime scene, the Government sought to paint "a picture in [the jury's] mind" about what Fields was doing during this shoot-out.  January testified that his investigation showed that Fields and an accomplice cornered King in the courtyard of an apartment complex.  He further testified that

119

"Fields had driven a vehicle around and [began] firing a weapon through the southeast corner." Fields's accomplice was firing from an opposite corner, and King "was kind of caught in a cross-fire." According to January, King was hit and sustained serious injuries that required surgery. Specifically, he had suffered "a punctured lung."

January also testified about his interview of King, which took place in the intensive care unit of a hospital the day after the shooting. Although King was lucid enough to be interviewed, "he couldn't speak words very well without grimacing in pain." According to January, he showed King a photo lineup to see if King could pick out the men who shot him. January said King whispered that Fields fired the shot that hit him in the upper torso: "[King] pulled me close . . . and told me that [Fields is] the one that shot [him]."

## 2. Application of *Davis/Hammon*

Under the Supreme Court's recent decisions in *Davis v. Washington* and *Hammon v. Indiana*,[60] the statements related by January at Fields's sentencing were testimonial hearsay.[61] Both the eyewitness statements and King's statements from the intensive care

---

[60] The *Hammon* case was decided jointly with *Davis* in a single opinion. Discussions of either case are referenced with a citation to *Davis*, the lead-captioned case.

[61] The Government does not argue that the statements were nontestimonial.

unit bear substantial similarity to the testimonial statements in the *Hammon* case. For instance, all of the statements related by January were given in response to police questioning. *See Davis*, 126 S. Ct. at 2278. As in *Hammon*, all deliberately narrated past criminal events. *See id.* The declarants here, like in *Hammon*, were interviewed away from the defendant, Fields.

Additionally, the statements at issue are substantially different from those the Supreme Court found nontestimonial in *Davis*. In *Davis*, the Court found nontestimonial statements given to a 911 operator for the purpose of resolving a present emergency. *See id.* at 2276. January's testimony indicated that he was not addressing an "emergency in progress" but instead was conducting a criminal investigation. *See id.* As to the crime scene investigation, January testified that he responded *after* the victim of the shooting "had left that location by private vehicle." January never testified that he or any other responding officer heard gunfire. *Compare id.* at 2278 ("[T]he interrogating officer [in *Hammon*] testified that he heard no arguments or crashing and saw no one throw or break anything.") Moreover, in conjunction with interviewing witnesses, January and the other responding officers looked for physical evidence, ultimately collecting "a number of shell casings" and a bullet.

As to King's identification of Fields, that was given to

121

January from a hospital room a day after the incident.  *See id.* at 2276 (noting that the statements found testimonial in *Crawford* "took place hours after the events [the declarant] described").  These circumstances show January was conducting a criminal investigation, as he himself testified repeatedly.  He "was not seeking to determine 'what is happening,' but rather 'what happened.'"  *Id*. at 2278.

Furthermore, under *Davis/Hammon*, it is not critical that the interrogations occurred in an arguably informal setting.  The majority in *Davis/Hammon* pointedly rejected the dissent's approach, which would have limited testimonial statements to those given under circumstances "sufficiently formal to resemble the Marian examinations."[62]  *Id.* at 2284 (Thomas, J., dissenting).  Instead, the majority held, "It imports sufficient formality . . . that lies to [police] officers are criminal offenses."  *Id*. at 2278 n.5.

The objective circumstances indicate that the primary purpose of the police questioning at issue was to "nail down the truth about past criminal events."  *Id*. at 2278.  Thus, the statements given in response were testimonial.  The Government did not es-

---

[62] "Pretrial examinations became routine under two statutes passed during the reign of Queen Mary in the 16th century.  These Marian bail and committal statutes required justices of the peace to examine suspects and witnesses in felony cases and to certify the results to the court. . . . Whatever the original purpose . . ., they came to be used as evidence in some cases . . . ."  *Crawford*, 541 U.S. at 43 (internal citations omitted).

tablish that the declarants were unavailable, and Fields had no opportunity to cross-examine them. Therefore, the introduction of the testimonial statements violated the Confrontation Clause. *See Crawford*, 541 U.S. at 53–54.

### 3. The *Crawford* Violation Was Not Harmless

The Government contends that any *Crawford* error is harmless. "Confrontation Clause errors . . . are subject to harmless-error analysis." *See Hall*, 152 F.3d at 406. Since constitutional error is at issue, "[t]he burden of proof is on the Government to show that the error was harmless by proving beyond a reasonable doubt that the error did not contribute to the sentence received." *United States v. Garza*, 448 F.3d 294, 301 (5th Cir. 2006). In this case, the Government cannot meet that "arduous burden." *United States v. Pineiro*, 410 F.3d 282, 284–87 (5th Cir. 2005).

January's testimony was significant evidence. It was the only evidence showing that Fields participated in the King shooting. The Government discussed the incident at closing as part of its contention that Fields previously had "participated in attempted murders and other serious acts of violence," which it had alleged as a nonstatutory aggravating factor: "You also heard that [Fields] was released in July of 2000 . . . and after that in approximately September he and [an accomplice] shot at Ladon King." After listing several other incidents (some of which also were proven

with unconfronted testimony[63]), the Government stated: "Those are the other attempted murders and other serious acts of violence, some of them, you heard the evidence on many, but those are the ones I want you to think about."

In addition, the Government used the King shooting in its rebuttal closing argument to counteract the defense's case for impaired capacity. It argued that Fields had control over himself despite his tragic background: "He made choices along his whole life." As an example, the Government pointed to the King shooting, stating that Fields "chose . . . to go to an apartment complex with kids and people and have a shoot-out with another drug dealer." More broadly, the Government's case that Fields had a track record of serious violence was central to its case at sentencing. Fields's participation in the attack January described provided substantial support for that theme.

The record indicates that the jury considered its sentencing decision to be a difficult one. After deliberating for six hours, the jurors sent the district court a note inquiring what sentence would be imposed if they could not agree. Later, the jury sent another note stating flatly, "We cannot come to a unanimous agreement." Only after the court instructed the jury to continue deliberating did it return a death verdict.

---

[63] *See, e.g.*, Sub-parts B. & C., *infra.*

Courts often have been unwilling to find error harmless where the record, as in this case, affirmatively shows that the jurors struggled with their verdict. "The fact that a jury initially was deadlocked and reached a verdict only after receiving an *Allen* charge may support an inference that the case was close." *United States v. Jean-Baptiste*, 166 F.3d 102, 109 (2d Cir. 2002); *see also Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003) (finding prejudice in part because, "at one point in its sentencing deliberations, the jury informed the court that it was 'at a stalemate' and could not agree whether to impose a death sentence"); *United States v. Varoudakis*, 233 F.3d 113, 127 (1st Cir. 2000) (jurors' note stating that they were "at an impasse" in their deliberations "reveal[ed] uncertainty about [the defendant's] guilt" and "weigh[ed] against a finding of harmless error"); *Medina v. Barnes*, 71 F.3d 363, 369 (10th Cir. 1995) (holding that the jurors' statement "at one point during their deliberations . . . that they might be unable to reach a unanimous verdict" was a circumstance suggesting error was prejudicial). Reluctance to find harmless error despite a jury note indicating an impasse is especially appropriate here, on direct review, where the Government's burden of proof is at its apex.

There are other indications that the sentencing issue was close. The jurors *unanimously* found a number of substantial mitigating factors, including that Fields (1) suffered physical abuse

125

during his formative years, (2) suffered emotional abuse during his formative years, (3) suffered from parental neglect during his formative years, (4) was exposed to the violent deaths of family members, loved ones, and friends during his formative years, (5) lived most of his life without having a significant father figure, (6) is the product of an impoverished background which impaired or hampered his integration into the social and economic mainstream of society, and (7) spent significant periods of his life in solitary confinement.

Some jurors found other significant mitigating factors. Eleven jurors found, for example, that Fields's behavioral problems may decrease over time and that a death sentence would cause emotional injury, harm, and loss to Fields's family. Two jurors found that Fields committed his crime "under unusual and substantial duress." One found that Fields had recently responded well to a structured environment and likely would adapt to prison life if he were sentenced to life imprisonment.

The Government maintains nonetheless that any error was harmless beyond a reasonable doubt. It points to nontestimonial sentencing evidence showing that Fields was involved in numerous other violent and criminal incidents beyond the King shooting. While some of those extra incidents are significant, they do not eliminate reasonable doubts that the erroneously admitted testimony repeatedly stressed by the government regarding the King shooting

126

tipped the scales for at least one of the jurors, thereby enabling a death sentence.

The Government's proof of Fields's involvement in the King shooting—which occurred much closer in time to Fields's trial than his previous attempted murder—may have added significant weight to the death side of the scale. The Government has not shown beyond a reasonable doubt that the verdict would have been the same absent this added weight. Given that the Government emphasized the King shooting at closing, that the jury struggled to reach a verdict, and that it found significant mitigating factors, the testimonial hearsay related by January was not harmless. I would vacate Fields's death sentence.

B. Additional *Crawford* Claims

Apart from the testimonial hearsay related to the King shooting, the government repeatedly relied on testimony to make its case for a death sentence. As just one example, a Killeen police officer, Daniel Tichenor, was allowed to testify based on witness reports that Fields was involved in an armed robbery, despite Fields's objection that he should be allowed to confront the witnesses themselves. Tichenor testified that two alleged victims of an armed robbery contacted the police department in December 2000. According to Tichenor, "They indicated to the patrol officers that responded that they were robbed at gunpoint by two subjects," one of whom "they identified as . . . Sherman Fields."

127

Tichenor testified to the details of the alleged crime based on what the victims said: "They indicated that they were in a car driving along with . . . Fields" and an accomplice. "While driving down the street, [Fields's accomplice] pulled out a gun, demanded money from both and the jewelry that both the two victims had with them. [He] fired a shot inside the car. Both subjects ended up giving their jewelry and money to Mr. Fields and [his accomplice] . . . ." Tichenor also testified that Fields's accomplice told Tichenor that he and Fields had driven from Waco to Killeen that day to buy $4500 in crack cocaine. Tichenor further stated that Fields's accomplice admitted to firing a shot in the car in order to scare them.

The statements related by Tichenor are testimonial for the same reasons that the statements related by January are testimonial. The investigating police officers responded to do an after-the-fact criminal investigation. They were not addressing an ongoing emergency. The declarants described past criminal conduct to persons they knew were police officers. Finally, the record implies that the statements at issue were given in direct response to questioning.

This testimony, like Officer January's, very well could have been the difference between life and death for Fields. Beyond Officer January's and Tichenor's testimony, the list goes on and

on.[64]

## III.  Conclusion

Sherman Lamont Fields was sentenced to death based on testimony that he was never able to confront.  That is precisely the evil that the Confrontation Clause was meant to protect against.  That troubling fact cannot be remedied by categorizing the testimony as speaking to selection as opposed to eligibility factors.  The jury's difficulty in agreeing on a sentence and the number of mitigating factors found highlight how artificial that distinction can be.

I would find that the Confrontation Clause applies to capital sentencing as it is structured under the FDPA and remand this case for resentencing.

---

[64] Fields also argues that his confrontation rights were violated by the Government's introduction of Fields's (1) McLennan County Jail records, (2) Federal Medical Center records, (3) juvenile delinquency file, and (4) Texas Department of Criminal Justice records.  These documents contained unfavorable statements from probation officers, corrections officers, psychologists, and other declarants who did not testify at Fields's trial.  In all, the exhibits contain hundreds of pages, which Fields argues are "replete with hearsay statements."

There is no need to evaluate Fields's claims, because the unconfronted testimony he has already shown would be enough to warrant resentencing.  But certainly these additional claims—which the district court never evaluated because it found the Confrontation Clause did not apply—are cause for additional concern.